[767 NYS2d 451]

In the Matter of STANLEY FRIEDENBURG et al., as Executors of GWENDOLYN LONDINO, Deceased, Respondents, v NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION, Appellant.

Second Department, November 24, 2003

## APPEARANCES OF COUNSEL

*Eliot Spitzer, Attorney General*, New York City (*Gregory J. Nolan, Marion R. Buchbinder* and *Norman Spiegel* of counsel), for appellant.

*Esseks, Hefter & Angel*, Riverhead (*Stephen R. Angel, Anthony C. Pasca* and *Nica B. Strunk* of counsel), for respondents.

## OPINION OF THE COURT

S. MILLER, J.P.

This appeal presents us with the opportunity to address issues arising from the application of New York State wetlands regulations, as administered by the appellant, the New York State Department of Environmental Conservation (hereinafter the DEC), which have virtually eliminated the ability of the petitioners to utilize waterfront real property. The ultimate question to be answered is whether the application of these regulations rises to the level of a taking, thereby requiring the payment of monetary compensation. Under the circumstances of this case, we agree with the Supreme Court that a taking has occurred.

### I

The parcel of real property at the center of the instant controversy is approximately 2.5 acres in area, located on the north side of Meadow Lane in the Village of Southampton. The property is situated within a residential zone, pursuant to the zoning ordinance of the Village of Southampton. The lot fronts upon the south shore of the Shinnecock Bay and is immediately east of the adjacent Southampton helicopter landing pad. All but a small upland portion of the parcel has been classified as tidal wetlands.

Insofar as relevant to this appeal, the property was purchased in 1962 by the late Gwendolyn Londino, who died on October 12, 1983. It is now owned by her estate, under the control of the petitioners who are the executors thereof.

It is generally acknowledged that at the time of purchase, the wetland areas on the property could legally have been filled in, and there were essentially no restrictions to prohibit the construction of a single family home. In 1973, New York State adopted the Tidal Wetlands Act (ECL art 25; L 1973, ch 790). Pursuant thereto, the DEC determined that virtually all of the subject parcel should be designated as tidal wetlands. In or about 1987, the petitioners applied for a tidal wetlands permit for the construction of a single family residence. After extensive administrative proceedings, the DEC denied the application via a written decision dated April 14, 1995, because, inter alia, the septic system of the proposed project would cause the release of sewage effluent containing pathogenic bacteria and viruses into the waters of Shinnecock Bay and into the nearby wetlands.

Concomitantly, in October of 1989, the Village of Southampton adopted wetlands regulations as part of its zoning code in article III (A) entitled "Wetlands." The wetlands code is administered by the Village's Zoning Board of Appeals (hereinafter the ZBA). Contemporaneous with the proceedings for a wetlands permit before the DEC, the petitioners applied for a village wetlands permit. The ZBA denied the application without prejudice, on the ground that the DEC's denial of the application for a state wetlands permit precluded the ZBA from granting approval for a village permit (see ECL 25-0302 [1]).

## II

The petitioners thus commenced this proceeding in 1995 for an order annulling the DEC's April 14, 1995, determination and directing the issuance of the state wetlands permit. In the alternative, the petitioners prayed, inter alia, that the DEC's action be regarded as a taking of property without just compensation, and that pursuant to ECL 25-0404, the DEC be ordered to commence condemnation proceedings.

The DEC moved to dismiss the proceeding; the motion was denied by order of the Supreme Court dated February 1, 1996. For procedural reasons, this Court modified the order in *Matter of Friedenburg v New York State Dept. of Envtl. Conservation* (240 AD2d 407 [1997]), to the extent of dismissing the petition-

er's cause of action seeking to annul the April 14, 1995, determination. However, this Court sustained the remainder of the petition, including the taking claims, finding that those claims stated valid causes of action.

On July 11, 1997, the DEC issued a letter pursuant to *Spears v Berle* (48 NY2d 254 [1979]), according to which the DEC indicated it would permit the following activities on the property:

"1. The uses listed in 6 NYCRR 661.5 as a use not requiring a permit (NPN) for a particular tidal wetland zone or adjacent area provided such activity does not involve a regulated activity (*see* 6 NYCRR 661.7 [a]);

"2. Installation of a four foot wide catwalk and associated pier with a 6 X 20 foot floating dock for water/boat access to the waters of Shinnecock Bay subject to the submission of depth soundings to calculate where 3 foot mean low water is located . . . A floating dock and ramp can be used for mooring and docking up to three boats. The catwalk can extend approximately 380 feet from the tidal wetlands boundary to navigable water;

"3. Installation of a 1,000 square foot pervious parking area parallel to Dune Road located 75 feet landward from the most landward edge of the tidal wetland;

"4. Installation of a 225 square foot structure such as a deck, garage, gazebo or storage shed for storage of boating equipment and other items 75 feet landward from the most landward edge of the tidal wetlands boundary;

"5. Permanent or seasonal mooring of a single family house boat at the dock described in #2 above provided there is sufficient water depth and provided there is a demonstrated means for handling septic and waste water via a commercial marina pumpout facility or on-site portable pumpout;

"6. Use as a parking or storage facility for the Village of Southampton's helicopter landing pad, subject to the conditions set forth in Nos. 3 and 4 above."

On January 18, 2000, the Supreme Court denied the DEC's subsequent summary judgment motion.

### III

A hearing was held on the petition in the Supreme Court on April 3, 4, 6, and 7, 2000. Ronald Haberman, a licensed real estate appraiser testifying for the petitioners, stated that using a comparable sales approach the market value of the property prior to enforcement of the tidal wetlands regulations on April 14, 1995, was $665,000, and after enforcement there was either no market value or the value was nominal. Haberman indicated that in determining the postenforcement value, he considered the uses enumerated in the *Spears* letter but could find no competitive market for property with those limitations. Edward Deyermond, the Tax Assessor of the Town of Southampton, applying the equalization rate to the assessment in the Village of Southampton's memorandum of taxes, testified that the market value of the parcel was $802,208 in 1993, $674,396 in 1994, and $664,761 in 1995.

John Holden, a professional engineer, confirmed that a septic system to serve a home could be built on the property under pre- and post-1995 Suffolk County health regulations. Anthony Tohill and Gilbert Flanagan, attorneys, testified that there was a great likelihood that local zoning approval to construct a house would be given to the petitioners if the DEC issued a permit.

Stanley Friedenberg, sued herein as Stanley Friedenburg, one of the executors for the estate of Gwendolyn Londino, testified that during the time he had been involved with the property, no one had approached him for the purpose of acquiring the property for any purpose associated with the helicopter landing pad.

Scott Strough, President of the Board of Trustees of the Freeholders and Commonality of the Town of Southampton (hereinafter the Trustees), testified that DEC approval would not preclude the need for the petitioners to seek a permit from the Trustees for the combination catwalk, ramp, floating dock, and houseboat referred to in the *Spears* letter as uses 2 and 5. He further testified that the Trustees denied a similar application by the owner of the property immediately to the east of the subject parcel (hereinafter the Newman parcel). He opined that the Trustees would deny the catwalk, ramp, and dock as referred to in use 2, and stated that approval for a smaller version of this project would be unlikely. Strough testified that the Trustees would not approve the mooring of a single-family

houseboat referred to in use 5. Strough stated that he spoke with his fellow board members about this and they shared his opinion as to the likelihood of permitting the proposals in the *Spears* letter.

Roy Haje, an environmental consultant, testified that use 1 in the *Spears* letter consisted merely of those uses for which no permit was necessary pursuant to the tidal wetland regulations. He further testified that it was very unlikely that the ZBA would approve the parking area in use 3 or the 225 square-foot structure in use 4 of the *Spears* letter.

Patrick Given, a licensed real estate appraiser, testified for the DEC that, using the sales comparison method, the market value of the petitioners' property never exceeded $50,000. The basis for this conclusion was his determination that the property was a wetlands parcel that could not be developed. Given's opinion was that the property's highest and best uses were for recreational purposes such as the water access uses referred to in the *Spears* letter. Given testified that the potential purchasers for such a parcel consisted primarily of neighbors. Given also referred to a comparable sale in 1993 of the 3.9-acre Newman parcel. This parcel, which consisted almost entirely of all or nearly all wetlands, was sold for $35,000.

George Stadnik testified that he was employed by the DEC as a marine resource specialist one whose duties included reviewing tidal wetlands applications. He recommended to Peter Corwith, a Southampton Town Trustee, that installation of a dock be approved for both the petitioners' property and the Newman parcel. Stadnik informed Corwith that there were several ways to obtain a permit to dock a vessel on these properties.

Patricia Zielenski testified that she was the Regional Supervisor of the DEC's real property office in Stony Brook. Zielenski testified that in August of 1999, the DEC offered $77,500 for the Newman parcel, but the sale never took place.

## IV

In its decision after the hearing, the Supreme Court concluded that the petitioners had established that the 1995 preregulation value of their property was $665,000. Moreover, notwithstanding that the petitioners demonstrated beyond a reasonable doubt that there was a strong probability that most, if not all, of the recreational uses 2 through 6 in the *Spears* letter would ultimately not be approved, the DEC had demonstrated that the property had a residual market value of $31,500 if it was used

as a means of gaining access to the waters of Shinnecock Bay. Nevertheless, the court found that a return of only $31,500 represented a diminishment of the market value of the petitioners' property of over 95% and constituted a compensable taking. The DEC now appeals from a judgment entered January 25, 2001, upon the foregoing decision. We affirm.

V

The Legislature has enacted strict guidelines for the application and granting of permits to landowners who wish to conduct regulated activities in and around inventoried wetlands (*see Matter of Gazza v New York State Dept. of Envtl. Conservation,* 89 NY2d 603, 612 [1997], *cert denied* 522 US 813 [1997]; ECL 25-0402, 25-0403). Any person aggrieved by the issuance, denial, suspension, or revocation of a permit may obtain judicial review pursuant to ECL 25-0404. Among the available relief: "In the event that the court may find that the determination of the commissioner constitutes the equivalent of a taking without compensation, and the land so regulated otherwise meets the interest and objectives of this act, it may, at the election of the commissioner, either set aside the order or require the commissioner to acquire the tidal wetlands or such rights in them as have been taken, proceeding under the power of eminent domain" (ECL 25-0404).

Where regulatory actions restrict the ability of a landowner to enjoy its property, judicial review follows a two-step process. "If the court finds that the permit denial is supported by substantial evidence, then a second determination is made in the same proceeding to determine whether the restriction constitutes an unconstitutional taking requiring compensation" (*de St. Aubin v Flacke,* 68 NY2d 66, 70 [1986]). In the instant matter, the petitioners do not argue that the denial of the permit was not supported by substantial evidence. Therefore, the issue before this court is whether the restriction constitutes a taking requiring the payment of just compensation.

"A landowner who claims that land regulation has effected a taking of his property bears the heavy burden of overcoming the presumption of constitutionality that attaches to the regulation and of proving every element of his claim beyond a reasonable doubt" (*de St. Aubin v Flacke, supra* at 76). In *Lucas v South Carolina Coastal Council* (505 US 1003 [1992]), a factually analogous matter dealing with coastal building restrictions, the United States Supreme Court stated that although regula-

tory takings jurisprudence has traditionally "eschewed any set formula . . . preferring to engag[e] in . . . essentially ad hoc, factual inquiries," there are at least two "categories" of regulatory action that require compensation "without case-specific inquiry . . . advanced in support of the restraint" (*Lucas v South Carolina Coastal Council, supra* at 1015 [internal quotation marks omitted]). The first category, a physical invasion of the property, is not applicable to this situation (*id.*).

The second category "is where regulation denies all economically beneficial or productive use of land" (*id.* at 1015*)*. The Court stated that "when the owner of real property has been called upon to sacrifice all economically beneficial uses in the name of the common good, that is, to leave his [or her] property economically idle, he [or she] has suffered a taking" (*Lucas v South Carolina Coastal Council, supra* at 1019; *see also Matter of Gazza v New York State Dept. of Envtl. Conservation, supra* at 616). In such a situation, a categorical taking is found without regard to the government's justifications for the regulation (*see Lucas v South Carolina Coastal Council, supra* at 1026).

Contrary to the petitioners' contentions, the effect of the wetlands regulations on its property is not a per se taking. In *Tahoe-Sierra Preserv. Council v Tahoe Regional Planning Agency* (535 US 302 [2002]), dealing with the issue of whether a temporary building moratorium constituted a taking, the United States Supreme Court clarified the distinction between a physical taking and a regulatory taking, and limited a *Lucas* analysis to extraordinary circumstances in which the government deprives a property owner of all economic uses. The basis for this distinction, the Court declared, is found in the text of the Fifth Amendment. Its plain language requires the payment of compensation whenever the government acquires private property for a public purpose, whether the acquisition is the result of a condemnation proceeding or a physical appropriation. But the United States Constitution contains no comparable reference to regulations that prohibit a property owner from making certain uses of his or her private property (*see Tahoe-Sierra Preserv. Council v Tahoe Regional Planning Agency, supra* at 331-332).

In a footnote, the Court provided guidance on how to identify the distinction. In determining whether government action affecting property is an unconstitutional deprivation of ownership rights under the Just Compensation Clause, a court must interpret the word "taken." When the government condemns or physically appropriates the property, the fact of a taking is typi-

cally obvious and undisputed. When, however, the owner contends a taking has occurred because a law or regulation imposes restrictions so severe that they are tantamount to a condemnation or appropriation, the predicate of a taking is not self-evident and the analysis is more complex (*id.* at 322 n 17).

Physical takings, according to *Tahoe-Sierra,* are as "old as the Republic" (*id.* at 322) and, for the most part, involve the straightforward application of per se rules. The Supreme Court observed that its "regulatory takings jurisprudence, in contrast, is of more recent vintage and is characterized by 'essentially ad hoc, factual inquiries' " (*id.* at 322, quoting *Penn Cent. Transp. Co. v City of New York,* 438 US 104, 124 [1978]) designed to allow " 'careful examination and weighing of all the relevant circumstances' " (*Tahoe-Sierra Preserv. Council v Tahoe Regional Planning Agency, supra* at 322, quoting *Palazzolo v Rhode Island,* 533 US 606, 636 [2001] [O'Connor, J., concurring]). The Court went on to instruct that it is "inappropriate to treat cases involving physical takings as controlling precedents for the evaluation of a claim that there has been a regulatory taking, and vice versa" (*Tahoe-Sierra Preserv. Council v Tahoe Regional Planning Agency, supra* at 323). The basis for this fundamental distinction is because "[l]and-use regulations are ubiquitous and most of them impact property values in some tangential way—often in completely unanticipated ways. Treating them all as *per se* takings would transform government regulation into a luxury few governments could afford" (*id.* at 324*)*.

However, several years earlier in *Lucas,* the Supreme Court applied a categorical or per se rule in a regulatory taking. In *Tahoe-Sierra,* the Court used the opportunity to clarify the holding in *Lucas* and narrow the exception in which a categorical or per se rule applies to a regulatory taking. "The categorical rule that we applied in *Lucas* states that compensation is required when a regulation deprives an owner of '*all economically* beneficial uses' of his land" (*Tahoe-Sierra Preserv. Council v Tahoe Regional Planning Agency, supra* at 330, quoting *Lucas v South Carolina Coastal Council, supra* at 1019 [emphasis in original]). The Court reiterated that the "statute [in *Lucas*] that 'wholly eliminated the value' [of the property interest] clearly qualified as a taking," but the holding in *Lucas* was "limited to 'the extraordinary circumstances when *no* productive or economically beneficial use of land is permitted' " (*Tahoe-Sierra Preserv. Council v Tahoe Regional Planning Agency,*

*supra* at 330, quoting *Lucas v South Carolina Coastal Council, supra* at 1017 [emphasis in original]). To emphasize the word "no" relative to productive use, the Court pointed to a footnote in *Lucas* which explained that the categorical rule would not apply if the diminution in value were 95% instead of 100%. Anything less than a "complete elimination of value" or a "total loss," the Court acknowledged, would require the kind of analysis applied in *Penn Central* (*Tahoe-Sierra Preserv. Council v Tahoe Regional Planning Agency, supra* at 330, quoting *Lucas v South Carolina Coastal Council, supra,* at 1019 n 8). In sum, the Court held that it is "clear that the categorical rule in *Lucas* was carved out for the 'extraordinary case' in which a regulation permanently deprives property of all value; the default rule remains that, in the regulatory taking context, we require a more fact specific inquiry" (*Tahoe-Sierra Preserv. Council v Tahoe Regional Planning Agency, supra* at 332).

Thus, an analysis of a regulatory taking spans both ends of a spectrum. At one end is a regulation that merely diminishes the value of the land requiring no compensation. At the other extreme is the regulation that results in a total deprivation in value, tantamount to a physical taking demanding just compensation (*see Lucas v South Carolina Coastal Council, supra*). In the instant case, it is conceded that the petitioners' property retains at least a 5% residuary value. In light of *Tahoe-Sierra,* a categorical or per se rule on a regulatory taking as applied in *Lucas* is not applicable here. Accordingly, we hold that the DEC's denial of a permit for a single family dwelling does not constitute a categorical or per se taking of the petitioners' property.

## VI

Notwithstanding that the petitioners have not established a per se taking, they have demonstrated a taking using the balancing test of *Penn Cent. Transp. Co. v City of New York* (438 US 104 [1978]), a test used prior to and after the *Lucas* decision. When there is no per se taking, the courts are required to engage in ad hoc, factual inquiries (*see Penn Cent. Transp. Co. v City of New York, supra* at 123-124). "Where a per se taking is not demonstrated, whether a taking has occurred may be determined by an examination of various factors such as those set forth in the *Penn Central* case: the economic impact of the regulation, the extent to which the regulation has interfered with reasonable investment-backed expectations, and the

character of the governmental action" (*Matter of Gazza v New York State Dept. of Envtl. Conservation, supra* at 617; *Lucas v South Carolina Coastal Council, supra* at 1019-1020; *Penn Cent. Transp. Co. v City of New York, supra* at 124).

There was significant testimony regarding the economic impact the regulation had on the subject property. The regulation left only a residual value. The court found that the property was reduced in value by 95% from its nonregulated value. Even if not considered a total destruction in value, there has been a near total or substantial decrease in value.

The DEC contends that the economic impact factor weighs in favor of finding no taking under the *Penn Central* case. First, it argues that the regulation of the property, "while reducing the value of the subject lot, did not have sufficient economic impact so as to work a taking." The DEC contends that the trial court improperly valued the property at $31,500 based on an incorrect assumption that the uses listed in the *Spears* letter were not likely to be approved. Instead, the DEC argues that the court should have accepted its after-regulation value of $50,000.

The petitioners adduced the testimony of Ronald Haberman, an appraiser, who valued the property prior to the enactment of the wetlands regulations. Based on an analysis of comparable sales of vacant waterfront property, Haberman determined that the preregulation value of the property as of April 14, 1995, (the date of the DEC's decision) was $665,000. The DEC did not provide any preregulation assessment of the value of the property. As the DEC failed to rebut this finding, and the assessment was supported by credible evidence, this finding of fact by the hearing court should not be disturbed.

The value of the property after the regulation depends on what remaining uses are available to the property owners. In making such a determination, the court may look to the uses specified in the *Spears* letter. However, a petitioner may rebut the proposed list of uses. In *de St. Aubin v Flacke (supra)*, the Court of Appeals stated that a landowner may be able to further limit the after-regulation uses proposed in a *Spears* letter by proving that "there is no reasonable probability" that the local municipality would approve those uses (*de St. Aubin v Flacke, supra* at 78). An owner is required to "prove that relief from the zoning restriction is not reasonably to be expected" (*id.* at 76).

Here, the hearing court found that the petitioners proved, beyond a reasonable doubt, that there existed a "strong prob-

ability that most, if not all, of the recreational uses 2 through 6 in the *Spears* letter would not ultimately be approved." Haberman testified that he could not find a competitive market for the passive uses listed under the first point in the *Spears* letter, that is, uses allowed without a wetlands permit under 6 NYCRR 661.5. As to use 2, a catwalk, pier, or dock, Strough testified that the Southampton Trustees had denied a similar application and would likely deny the one proposed in the *Spears* letter. With respect to uses 3 and 4, a 1,000 square-foot pervious parking area and a 225 square-foot deck, garage, gazebo, or storage shed, Roy Haje testified that it was very unlikely that those structures would be approved by the Southampton ZBA. Strough further testified that use 5, a mooring of a single-family houseboat, would not be approved by the Trustees. Finally, Haje testified that it would be unlikely that use 6, parking or storage for the helipad, would be approved by the Village. Friedenberg testified that no one had approached him in connection with acquiring the property for that use. Based on these findings, the court determined that the residual property value was $31,500, which was an adjusted comparable sale amount for a similar nearby parcel as reported by the DEC's appraiser, Patrick Given.

Even if we were to accept the DEC's arguments and credit its proposed after value of $50,000, the result would not change. The change in value would be the difference between an overall loss of 95% as opposed to a loss of 92.5% using the $50,000 value. In either case there is a significant reduction in the value of the property. This Court in *Chase Manhattan Bank v State of New York* (103 AD2d 211 [1984]) held that an 86% reduction in value could support a finding that the property's economic value had been destroyed. This Court found that with respect to a constitutional taking claim, the property owner would have, at least, a reasonable probability of success in court (*id.* at 223-224).

It warrants emphasis that the facts of the instant case are significantly different from those of *Matter of Gazza v New York State Dept. of Envtl. Conservation (supra),* where the landowner acquired the waterfront parcels after the enactment of the wetlands regulations, and at prices reflecting the diminished values of the parcels as regulated. Thus, the denial of the application of the property owner in *Gazza* for setback variances was not tantamount to a taking, because that property owner did not lose a development right; it had already been restricted prior to his purchase of the land. In stark contrast, in the instant case,

Gwendolyn Londino's acquisition of the subject parcel in 1962 predated the enactment of wetlands regulations. The rights she obtained, which are now administered by the petitioners on behalf of her estate, *included* development rights that were subsequently lost as a result of the enactment of wetlands regulations. Thus, the holding of *Gazza* does not control the instant matter.

For these reasons, the petitioners established, beyond a reasonable doubt, that the regulation and denial of the permit destroyed all but a bare residue of the economic value of the property (*see Matter of Ward v Bennett,* 214 AD2d 741 [1995]).

## VII

The DEC argues that it has legitimate reasons for regulating tidal wetlands, which prevent the petitioners from succeeding on a takings claim. This contention is without merit. The legitimacy of a governmental regulation does not lead to the result that the government has no obligation to pay compensation as a result of that regulation. "[T]he Fifth Amendment's guarantee . . . [is] designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole" (*Penn Cent. Transp. Co. v City of New York, supra* at 123-124, quoting *Armstrong v United States,* 364 US 40, 49 [1960]). The United States Court of Appeals for the Federal Circuit explained this element of the balancing test as follows:

> "When there is reciprocity of advantage . . . then the claim that the Government has taken private property has little force: the claimant has in a sense been compensated by the public program 'adjusting the benefits and burdens of economic life to promote the common good.' [(*Penn Cent. Transp. Co. v City of New York, supra* at 124.)] Thus shared economic impacts resulting from certain types of land use controls have been held to be non-compensable. [(*Agins v City of Tiburon,* 447 US 255, 262-263 [1980].)] . . . That the purpose and function of the regulatory imposition is relevant to drawing the line between mere diminution and partial taking should not be read to suggest that when Government acts in pursuit of an important public purpose, its actions are excused from liability. To so hold would eviscerate the plain language of the Takings Clause,

and would be inconsistent with Supreme Court guidance. It is necessary that the Government act in a good cause, but it is not sufficient. The takings clause already assumes the Government is acting in the public interest: 'nor shall private property be taken for public use without just compensation.'
. . .

"In addition, then, to a demonstration of loss of economic use to the property owner as a result of the regulatory imposition . . . the trial court must consider: are there direct compensating benefits accruing to the property, and others similarly situated, flowing from the regulatory environment? Or are benefits, if any, general and widely shared through the community and the society, while the costs are focused on a few? Are alternative permitted activities economically realistic in light of the setting and circumstances, and are they realistically available? In short, has the Government acted in a responsible way, limiting the constraints on property ownership to those necessary to achieve the public purpose, and not allocating to some number of individuals, less than all, a burden that should be borne by all?" (*Florida Rock Indus. v United States,* 18 F3d 1560, 1570-1571 [1994], *cert denied* 513 US 1109 [1995].)

Here, the balance does not favor a finding of reciprocity of advantage or shared benefit. The petitioners have been left with a situation where their only viable choice is to leave the property in its natural state. The regulation has caused an almost total loss of the value of the property. The petitioners are thus bearing all the burden of the regulation. The Supreme Court stated in *Lucas* that when the impact of the regulation on a property owner is severe, it is less realistic to "indulge our usual assumption that the legislature is simply adjusting the benefits and burdens of economic life . . . in a manner that secures an average reciprocity of advantage to everyone concerned" (*Lucas v South Carolina Coastal Council, supra* at 1017-1018 [internal quotation marks omitted]).

Because the impact is so severe in this case, it is clear that a taking has taken place as the petitioners are bearing the brunt of the burden. Therefore, it is apparent that the petitioners have established a taking pursuant to the pre-*Lucas* balancing test.

## VIII

The DEC contends that if this Court should uphold the finding that a taking has occurred, the Supreme Court lacks jurisdiction to entertain the claim for damages as such a determination must be made in the Court of Claims. This is a correct statement of law (*see* Court of Claims Act § 9 [2]). Accordingly, if the DEC chooses to acquire the property under the exercise of its powers of eminent domain, which is its only option other than granting the petitioners' permit application (*see* ECL 25-0404), any further proceedings to determine the compensation to be paid to the petitioner will be conducted in the Court of Claims.

Accordingly, the judgment is affirmed, with costs.

KRAUSMAN, GOLDSTEIN and RIVERA, JJ., concur.

Ordered that the judgment is affirmed, with costs.