OPINION OF THE COURT
Michael D. Stallman, J.
Motion sequence numbers 001 and 003 are consolidated herein for disposition.
Plaintiffs challenge inter alia the constitutionality of Local Law 64 (Local Law No. 64 [2003] of City of New York, Int 569-A), which amends the Administrative Code of the City of New York in relation to the ownership, installation and maintenance of, and placement of advertisements on newsstands.[1] Newsstand structures are currently owned by persons who hold licenses to operate them. Under Local Law 64, newsstands will be owned under a single franchise which will rebuild and maintain the new structures at its expense; the structures will continue to be operated by individual licensees.
*153 Plaintiffs Bernard Uhlfelder, Gulam Mohamed Contractor, Joel Greenberg, Anil Mukhatiyar, Kishor Parekh, Hansa Patel, Mike Patel, Frank Senior, Mark Sepanski, Mary Whalen, and Jitendra Zaveri claim to be owners and operators of newsstands in New York City; the New York City Newsstand Operators Association is a membership organization comprised of newsstand operators. The individual plaintiffs assert that they have operated their newsstands for a minimum of eight and a maximum of over 30 years.
In motion sequence 001, plaintiffs, by order to show cause, inter alia, seek to preliminarily enjoin the City[2] from implementing, applying or enforcing Local Law 64. Plaintiffs also seek to enjoin defendants from entering into a contract with a franchisee to create a Coordinated Street Furniture Franchise (CSFF) for the implementation of Local Law 64.
Defendants cross-move, pursuant to CPLR 3211 and 3212, for summary judgment dismissing the complaint in its entirety.
In motion sequence 003, plaintiffs move, by order to show cause, pursuant to CPLR 3212 (f) and 3214 (b), for an order compelling defendants to produce “plans, dimensional information, drawings and related documents sufficient to show the design, style, width, functionality, disability-law compliance, and advertising placement, of the proposed new newsstand structures” (the plans).
Background
Approximately 300 newsstands currently exist in the City of New York. Each newsstand is operated by someone holding a license issued by DCA. The licensees operate out of structures which they built at their own expense or purchased from a prior licensee.
*154 Local Law 64 was not the City’s first effort to replace individually-owned newsstands with ones owned under a single franchise. In 1994, the then-mayor created an interagency task force to develop a master plan to reduce congestion from sidewalk obstructions and to better regulate the streetscape of New York City. The task force considered plans for newsstands, bus stop shelters, and public toilets, among other sidewalk uses.
In 1997, the City Council enacted Local Law No. 29, amending the Administrative Code with respect to newsstands, creating a new concession scheme to operate newsstands, and establishing a single franchise for the design, construction, installation and maintenance of newsstands, implementing a task force plan for a CSFF.
After passage of Local Law 29, DOT issued a request for proposals (RFP) seeking a single franchisee to build the new newsstands. In connection with that process, DOT conducted a review in compliance with the community input requirements of the Uniform Land Use Review Procedure (ULURP), under New York City Charter, chapter 8, § 197-c. In addition, DOT, as the lead agency for environmental purposes, determined that the proposed action would not have a significant impact on the environment, and issued a negative declaration, pursuant to the State Environmental Quality Review Act (SEQRA) (ECL 8-0101 et seq.) and the City Environmental Quality Review (CEQR) (Mayoral Executive Order No. 91, as amended by 62 RCNY 5-01 et seq.)[3]
Several newsstand operators challenged the constitutionality of Local Law 29 in federal court, contending that the law improperly granted “unfettered discretion” to licensing officials both to determine fitness of an applicant to operate a newsstand as a concessionaire, and to terminate permits; imposed an unconstitutional tax on the exercise of First Amendment rights; and violated the Equal Protection Clause. The federal court granted a preliminary injunction barring implementation of Local Law 29, to the extent that it permitted the Commissioner of the Department of Transportation unlimited discretion to terminate a newsstand concession, and otherwise denied *155 plaintiffs’ motion for preliminary relief. (Gasparo v City of New York, 16 F Supp 2d 198 [ED NY 1998].)
Following the court’s ruling in Gasparo, in June 1998, the City decided not to proceed with the awarding of a contract pursuant to Local Law 29. The adoption of Local Law No. 41, effective August 27, 1998, effectively repealed the RFE
In 2003, the City decided to revive the CSFF proposal. On October 8, 2003, the Department of City Planning (DCP) determined that revival of the CSFF would not present any new land use issues that would require a new review pursuant to ULURE On March 19, 2004, the DCP confirmed its earlier decision.
Also on October 8, 2003, the DOT again issued a negative declaration pursuant to SEQRA/CEQR determining that “there will be no significant impact on the quality of the environment as a result of the proposed action.”
Local Law No. 64, passed by the City Council on October 15, 2003, mandates the replacement of all existing newsstands by new newsstands that are owned, constructed, and maintained by a single franchisee, and permits exterior advertising to be placed on the newsstands by the franchisee. Pursuant to the RFP issued by the City, a portion of the income from that advertising will be paid to the City. In addition, 2.5% of the total advertising space will be retained by the City for purposes of public service advertisements, and an additional 20% will be reserved for use by the City and its private marketing partners at no cost to the City.
Local Law 64 continues the current licensing system, rather than creating a new system of concessions to operate the newsstands. Persons currently holding licenses will be permitted to operate out of the newly-constructed newsstands at no cost. New licensees, however, must pay the franchisee for the cost of constructing the newsstand out of which the new licensee will operate, in addition to paying regular license fees.
Local Law 64 requires that a newsstand shall not be sited so as to pose an obstruction to the free use of the sidewalk by pedestrians. The location of a newsstand may not: (i) reduce the area maintained on the sidewalk for pedestrian movement below a width of 972 feet (clear-path requirement); (ii) be within five feet of a fire hydrant; (iii) create a level of service at the proposed location for the peak 15 minutes of the peak hour of a pedestrian flow rate equal to or greater than 11 people per min *156 ute per linear foot of clear path, as determined by the DOT (pedestrian level of service [PLOS]); (iv) be within 15 feet of an entrance to or exit from a subway; (v) extend into the area encompassed by the extension of the property lines from the buildings to the curb at the intersection of two streets and the area 10 feet on either side of such lines; (vi) extend into a bus stop; or (vii) otherwise create a hazardous condition.
All newly-constructed newsstands must be designed and built in compliance with the Americans With Disabilities Act (ADA) (42 USC § 12131 et seq.; 28 CFR part 35).
Newsstands which fail to meet the siting requirements will be permitted to relocate within a “catchment area,” i.e., within a radius of 500 feet of their current location, if they will then meet the above requirements. If so, current siting requirements regarding distance from fire hydrants and subway entrances will be applied to them, rather than more stringent distance requirements which will be applicable to newsstands erected at new locations. Plaintiffs allege that Local Law 64 would force 64 of the current 281 newsstands out of business. Plaintiffs contend that Local Law 64 is overly broad and vague, and grants the City unfettered discretion in determining whether, and to whom, a license to engage in free speech will be granted, in violation of the First Amendment of the United States Constitution and article I, § 8 of the New York State Constitution; will result in the seizure of current newsstands in violation of the Takings Clause of the State Constitution; will compel news dealers to engage in involuntary advertising in violation of their free speech rights under the federal and state constitutions; violates the Equal Protection and Due Process Clauses of the federal and state constitutions; and was implemented in violation of the community input (ULURP) and environmental study (SEQRA/CEQR) requirements. Plaintiffs seek both injunctive relief and money damages and declaratory relief as to the RFE
Motion Sequence Number 001
Plaintiffs seek a preliminary injunction barring implementation of Local Law 64 pending determination of this action. Defendants cross-move to dismiss the complaint in its entirety. Because defendants’ cross motion for summary judgment could dispose of plaintiffs’ preliminary injunction request, defendants’ motion will be analyzed first.
The standards for a summary judgment motion are clear. Defendants must make a prima facie showing of entitlement to *157 judgment as a matter of law, making a sufficient showing to demonstrate the absence of any material issues of fact. (Winegrad v New York Univ. Med. Ctr., 64 NY2d 851, 853 [1985]; Zuckerman v City of New York, 49 NY2d 557, 562 [1980]; Sillman v Twentieth Century-Fox Film Corp., 3 NY2d 395, 404 [1957].) In order to defeat the motion, plaintiffs must demonstrate, by admissible evidence, the existence of a factual issue requiring trial of the action. (Zuckerman, 49 NY2d at 560.)
The tripartite test for preliminary injunctive relief under New York State law requires that the movant establish: (1) a likelihood of success on the merits; (2) irreparable harm if the injunction is denied; and (3) a balance of the equities in favor of the injunction. (See CPLR 6312 [a]; Aetna Ins. Co. v Capasso, 75 NY2d 860 [1990]; Matter of Merscorp, Inc. v Romaine, 295 AD2d 431 [2d Dept 2002].)
Where a preliminary injunction is sought to prevent violation of First Amendment rights, it has been held that the moving party need not demonstrate that it is likely to suffer irreparable harm in the traditionally understood sense, because violations of First Amendment rights are commonly considered de facto irreparable injuries. (Bery v City of New York, 97 F3d 689, 693-694 [2d Cir 1996], cert denied 520 US 1251 [1997], citing Elrod v Burns, 427 US 347, 373 [1976] [“(t)he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury”].)
First and Fifth Causes of Action — Free Speech[4]
Plaintiffs contend that certain of the siting requirements for newsstands mandated by Local Law 64, particularly when taken together with the requirements of the ADA, improperly burden the exercise of First Amendment rights. They further argue that display space requirements and fee requirements for new licensees also violate the First Amendment. Plaintiffs assert that the law will burden their rights to disseminate First *158 Amendment material, thereby curtailing its availability to the public.[5]
It is well established that First Amendment protections apply to newsracks. (City of Lakewood v Plain Dealer Publishing Co., 486 US 750 [1988]; Gannett Satellite Info. Network, Inc. v Metropolitan Transp. Auth., 745 F2d 767, 772 [2d Cir 1984].) Relying on Gasparo v City of New York (16 F Supp 2d at 206-207), plaintiffs contend that First Amendment protections apply to newsstands as well.
Citing the plurality in Graff v City of Chicago (9 F3d 1309, 1314 [7th Cir 1993], cert denied 511 US 1085 [1994]) and Patel v New York City Art Commn. (NYLJ, May 11, 1994, at 31, col 6), defendants contend that the operation of a newsstand on New York City property is not protected First Amendment activity.
This court must determine if Local Law 64 violates the First Amendment. However, this court need not choose between either side’s sweeping generalizations. Even assuming that operation of a newsstand implicates rights under the First Amendment, the government may make reasonable regulations that regulate the time, place and manner of expression of speech, if the restrictions are content neutral, narrowly drawn to serve a significant governmental interest, and provide ample alternative channels for communication. (See Graff v City of Chicago, 9 F3d at 1319; Gasparo v City of New York, 16 F Supp 2d at 222; Patel v New York City Art Commn., supra.)[6]
An arbitrarily-applied governmental regulation, with unfettered discretion given to the authority enforcing it, however, is “inherently inconsistent with a valid time, place, and manner *159 regulation because such discretion has the potential for becoming a means of suppressing a particular point of view.” (Heffron v International Soc. for Krishna Consciousness, Inc., 452 US 640, 649 [1981].) Thus, “a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional.” (Shuttlesworth v Birmingham, 394 US 147, 150-151 [1969]; see also Niemotko v Maryland, 340 US 268, 271 [1951].)
Specific Provisions of Local Law 64
Discretion to Revoke Licenses
In addition to the individual requirements governing the size and placement of newsstands, Local Law 64 provides that the placement of a newsstand will not be considered to pose an obstruction to the free use of the sidewalks if it “does not . . . otherwise create a hazardous condition.” (Local Law No. 64 [2003] of City of New York § 5.)
Plaintiffs maintain that Local Law 64 is unconstitutional because it gives officials unfettered discretion to issue and revoke licenses based upon the criterion of avoiding “hazardous conditions,” and that the term “hazardous conditions” is unconstitutionally vague.[7] These arguments are unconvincing.
Plaintiffs rely upon Gasparo (16 F Supp 2d at 215), in which the court granted a preliminary injunction, enjoining a provision in Local Law 29 which gave the Commissioner of DOT the power to revoke at will a newsstand concession on 10 days’ notice, for any reason whatsoever, with no hearing. In doing so, the court noted that the “power to revoke [a license] at will can chill newsstand vendors’ exercise of First Amendment rights.” (Id.) The court, however, refused to enjoin the provision governing the City’s right to withhold a concession where it determined the applicant was unfit to be a concessionaire, concluding that DOT’s discretion was limited by objective criteria.
In Shuttlesworth (394 US 147 [1969]), the United States Supreme Court analyzed the type of subjectivity in discretion that is unconstitutional. Shuttlesworth invalidated a Birmingham ordinance that required the city commission to issue a parade permit unless in “its judgment the public welfare, peace, safety, health, decency, good order, morals or convenience require that it be refused.” (Id. at 149-150; see also Schneider v *160 State [Town of Irvington], 308 US 147, 158, 163-164 [1939] [invalidating a municipal ordinance which allowed the chief of police to deny a permit to a door-to-door solicitor if he determined the canvasser was “not of good character”]; Staub v City of Baxley, 355 US 313, 321 [1958] [invalidating a city ordinance granting discretion to deny permits to applicants requesting permission to solicit others to join their organization based on the “character of the applicant, the nature of the (business of the) organization for which members are desired to be solicited, and its effects upon the general welfare of (the) citizens of the City of Baxley”].)
These decisions, and others cited by plaintiffs, caution against delegation of unlimited discretion to licensing authorities, or their use of excessively broad, subjective evaluation criteria. (See generally MacDonald v City of Chicago, 243 F3d 1021, 1026-1027 [7th Cir 2001], cert denied 534 US 1113 [2002].)
Here, in contrast, Local Law 64 does not embrace highly subjective criteria for its siting rules; neither does it omit guidelines for the interpretation of its provisions, nor allow wholly discretionary revocation of licenses. The provisions of Local Law 64, as they apply to “hazardous conditions,” are described as including, but not being limited to, “the location of a newsstand less than one foot, six inches from the curb, under a fire escape, within ten feet of a driveway or parking lot or within two feet from underground access points, such as utility access openings, ventilation grills, or cellar doors.” (Local Law No. 64 [2003] of City of New York § 5.) These examples are objective and as measurable by newsdealers as by city inspectors. They provide reasonable and practical criteria needed to promote public safety.
Most licensing procedures involve administrative appraisal of facts and the exercise of judgment. Such discretion, if not appropriately limited and rationally exercised according to objective, defined, reasonable criteria, may pose a threat to First Amendment rights. (See e.g., Forsyth County v Nationalist Movement, 505 US 123, 130-131 [1992]; Cantwell v Connecticut, 310 US 296, 305 [1940].) However, specifying the kinds of factors to be considered in determining whether a newsstand creates “hazardous conditions” gives the City sufficient guidance and reduces any arguable indefiniteness to a level consistent with the City’s governmental obligation to provide for a safe urban environment. (See Foss v City of Rochester, 65 NY2d 247, 253 [1985] [“(d)ue process requires only a reasonable degree of *161 certainty so that individuals of ordinary intelligence are not forced to guess at the meaning of statutory terms”]; see also Grayned v City of Rockford, 408 US 104, 110 [1972] [“Condemned to the use of words, we can never expect mathematical certainty from our language”].)
Siting Requirements: Clear-Path Requirement, Pedestrian Level of Service Standards and the ADA
Local Law 64 contains several express provisions regarding the location of the newly-built newsstands, including but not limited to the amount of clear path around the structure and the rate of pedestrian flow at the location. In addition to these specific provisions, however, the newly-constructed structures must comply with the requirements of the ADA. Under the ADA, the newsstands must be wide enough to accommodate a wheelchair. Plaintiffs speculate that, in order to comply with ADA wheelchair requirements, the newsstands will have to be at least five feet wide. Plaintiffs contend that if all of the specific requirements, including the ADA size requirement, are met, 64 of the 281 existing newsstands will have to be relocated or will go out of business. This, plaintiffs contend, places too great a burden on the exercise of First Amendment rights, and, therefore, the requirements governing newsstands are not sufficiently narrowly tailored, particularly because less onerous requirements apply to other forms of street furniture and sidewalk uses. Plaintiffs note that, in City Council debates regarding Local Law 64, several members of the City Council conditioned their support of the proposal on the representation of administration officials that not more than 20 newsstands would be forced to relocate by the new siting requirements.
The City contends that the interpretation of ADA requirements by plaintiffs’ experts is incorrect, and that newsstands need only be three feet wide to comply with the ADA. The City relies in part on a diagram from the United States Department of Justice concerning necessary space to accommodate a wheelchair. That diagram, which does not specifically mention newsstands, appears to indicate that between 30 and 48 inches in clear floor space are needed for a wheelchair in an alcove, with an additional either 6 or 12 inches of maneuvering space.[8]
*162 Clear-Path Requirement
The clear-path component of Local Law 64 requires, without exception, that newsstands shall not be sited so as to reduce the area maintained on the sidewalk for pedestrian movement below a width of 9½ feet. (Local Law No. 64 [2003] of City of New York § 5.)
Plaintiffs argue that the clear-path component of the amendment required by section 5 of Local Law 64 is incompatible with the prior local law requirement of Administrative Code § 20-231 (e) and that Local Law 64 is, therefore, unconstitutionally vague. That section, governing clear-path minima, exempted newsstands in existence prior to August 1, 1991 from compliance, as long as they were not rebuilt. Plaintiffs contend that, as that section has not been repealed, Local Law 64 creates an inherent contradiction. This argument is specious.
The prior section applied to newsstands that were not rebuilt. Inasmuch as the CSFF requires that all newsstands be rebuilt, all newsstands will have been built after 1991. As a result, the grandfather clause that plaintiffs claim causes a contradiction will not apply to any newsstands. Therefore, there is no contradiction between the grandfather clause and the proposed requirement that all new newsstands meet the clear-path standards enumerated in Local Law 64; the new law is not unconstitutionally vague.
Plaintiffs also argue that the clear-path requirements, when read together with the ADA requirements, will place an impermissible burden on First Amendment rights. According to plaintiffs’ expert, Richard Bass, 58 newsstands fail to satisfy the clear-path requirements either currently, or once their footprints are enlarged to five feet, which Bass contends is necessary to comply with the ADA.
According to defendants, only 10 existing newsstands have less than the required 9½-foot clear-path space, six of those can reduce their size and still comply with the ADA, and, therefore, remain at their current location, and three of the other four newsstands can be moved to locations within 500 feet of their existing locations. Therefore, defendants contend, only one will have to relocate outside of its existing area.
Pedestrian Level of Service
Local Law 64 disallows a level of service at the proposed location for the peak 15 minutes of the peak hour of a pedestrian *163 flow rate equal to or greater than 11 people per minute per linear foot of clear path, as determined by DOT. (Local Law No. 64 [2003] of City of New York § 5.) Plaintiffs contend that six newsstands violate the PLOS requirements, but no other siting rules. Plaintiffs argue that other kinds of sidewalk furniture or uses have no flow rate, and this PLOS is more stringent than, for example, that applied to sidewalk cafes, which have a PLOS of 15, and that, therefore, the flow rate unreasonably burdens the First Amendment.
Defendants contend that the PLOS of 11 is reasonably based on federally-accepted guidelines laid out in the Federal Highway Capacity Manual issued by the Transportation Research Board. Defendants to do not appear to respond specifically to plaintiffs’ contention that six existing stands currently violate the flow rate of 11.
In reply, plaintiffs argue that the Federal Highway Capacity Manual does not discuss the appropriate flow rates for newsstands, but rather merely provides a mechanism for measuring flow rates. They further contend that this pedestrian flow rate was “enacted by the City as a political concession to a real estate interest, made in the course of give-and-take of developing the 1992 regulations upon which Local Law 64 is based.” (Plaintiffs’ reply mem in further support at 34.)
Plaintiffs further argue that the amount of clear path in the streets is more important than the congestion level. According to plaintiffs, New York City should have one PLOS for the entire city, and having differential PLOS requirements is irrational.
It is not, however, the court’s role to second-guess the City’s policy decisions concerning street furniture or to micromanage its implementation. Upholding the authority of the New York City Art Commission to reject an application to operate a newsstand at a specific location in Manhattan, the court in Patel v New York City Art Commn. (supra) stated: “ ‘[T]he city has broad power to regulate the use of the city streets and to provide by local law for the good government of the city and the preservation and promotion of the health, safety and general welfare of its inhabitants,’ ” quoting Good Humor Corp. v City of New York (290 NY 312, 316-317 [1943]).
Even assuming, as plaintiffs contend, that 64 newsstands would have to be relocated as a result of the siting requirements of Local Law 64, the law is content-neutral and leaves open ample alternate channels of communication to satisfy the *164 First Amendment.[9] (See, Graff v City of Chicago, 9 F3d at 1334 [Ripple, J., concurring].) The siting requirements, taken, together with the federal ADA requirements, are narrowly-drawn, rational, objective, content-neutral regulations that reasonably balance the licensees’ rights to conduct their businesses with a significant public interest. They do not unreasonably burden any cognizable First Amendment right.
Display Space Usage
Under the CSFF, the franchisee would be permitted to place a maximum of 82.5 square feet of advertising on the proposed new newsstands. Plaintiffs argue that the amount of space allocated to advertising will reduce the display space available to news vendors to promote their merchandise, and that the franchisee, under the CSFF, may place advertising on the front, sides, and top of the newsstand, thereby further restricting the First Amendment freedoms of the news vendors.
Currently, under 6 RCNY 2-68 (a) (5) “nothing may be affixed to, built into, or sold from the exterior sides, rear or roof of the newsstand . . . [and] no sales may take place other than at the front of the newsstand. No advertising may be placed on any newsstand.” Thus, as defendants contend, the plaintiffs now have no right to advertise or sell from the back or the sides of their newsstands. The provisions of Local Law 64 which permit the franchisee to utilize the sides of the newsstands for advertisements do not interfere with any rights of the newsstand operators. Moreover, permitting advertisements on those structures serves a significant interest of the City — that of raising revenue. (See U.S. Southwest Africa/Namibia Trade & Cultural Council v United States, 708 F2d 760, 767 [DC Cir 1983].)
Plaintiffs also contend that the provisions permitting advertising on their newsstands compel newsstand operators to engage in involuntary, unwanted speech. At least two of the plaintiffs, one Muslim, the other Hindu, state that they are deeply religious, and, therefore, do not sell magazines containing nudity or obscene materials, and that they would be extremely disturbed if sexually suggestive or provocative advertising were placed on the newsstands they operate. Plaintiffs rely on Wooley v Maynard (430 US 705, 714 [1977] [“the right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all”]). In Wooley v Maynard, however, plaintiffs *165 were objecting to a requirement that they disseminate on their own private property (their automobiles) an ideological message with which they disagreed. Plaintiffs here cannot legitimately assert that the anticipated advertising or public service messages are compelled speech. Rather, they seek to limit and thereby compel, the speech of others — the franchisees, advertisers and the City.
Under Local Law 64, newsstand operators will no longer be the owners of the structures from which they sell newspapers, magazines and other products.[10] Rather, they will be the tenants of the franchisee, which will own the newsstands. Thus, they have no more right to control the advertising on the structure from which they operate than the commercial or residential tenants of a building have to control advertising on the side of the building. To rule otherwise could have myriad unforeseen consequences for real property and landlord-tenant law and may impinge on the free speech rights of property owners and advertisers.[11]
In conclusion, plaintiffs do not state a cause of action based on the First Amendment. Defendants are entitled to summary judgment dismissing plaintiffs’ first and fifth causes of action with respect to the provisions of Local Law 64 governing siting requirements and advertising.
Fees for New Licensees
Under Local Law 64, in addition to normal license fees, new licensees will be required to pay the franchisee the cost of construction of the new newsstand structures from which they operate. Because the licensee will not own the structure, the payment will not be a purchase price, nor, according to plaintiffs, will it be rent, because the franchisee is not permitted to “lease” the newsstand. Plaintiffs contend that the “cost of construction” provision constitutes an excessive fee on constitutionally-protected activity.
*166 Although the actual cost that new licensees will have to pay is not specified in Local Law 64, Addendum III to the RFP specifies that, for licenses issued through December 31, 2005, the cost to the operators will be capped at $25,000 and will be amortized over five years. This is approximately what several of the plaintiffs allege that they spent to build their newsstands. After January 1, 2006, the cost will be adjusted annually by the rate of inflation for the previous year.
Defendants argue that the amortized cost is little different from the expenditures previously made by licensees who had to obtain loans to build their stands. Defendants also note that newsstand operators whose newsstands are located in subway stations or a city park, must pay annual fees of up to $155,000 and up to $50,000 for the cost of constructing stands, which revert to the Metropolitan Transportation Authority or the City. Finally, defendants contend that plaintiffs have no standing to challenge the provision regarding new licensees, because they will not have to pay for the newsstands that replace the ones they are currently operating.
With respect to standing, plaintiff New York City Newsstand Operators Association alleges that one of its members currently has an application pending for a new license and at least three of its members have indicated that they intend to apply for additional licenses (under current law an individual may operate up to two newsstands).
An organization can have standing to raise the concerns of its members where
“one or more of its members would have standing to sue; . . . the interests it asserts are germane to its purposes so as to satisfy the court that it is an appropriate representative of those interests[; and] . . . neither the asserted claim nor the appropriate relief requires the participation of the individual members.” (Society of Plastics Indus. v County of Suffolk, 77 NY2d 761, 775 [1991].)
Although the claims of the members who are merely considering applying for new licenses are speculative, the organizational plaintiff can, at least, represent the interest of its member whose license application is pending.
With respect to the merits of plaintiffs’ challenge to the provision requiring new licensees to pay the franchisee for the cost of construction of the newsstand, however, the court concludes that the provision does not constitute an impermissible burden on First Amendment rights. Indeed, plaintiffs do not articulate a cognizable First Amendment right personal to a licensee that *167 would be violated or chilled by the subject change. The new licensees, like plaintiffs, seek to use public property for private purposes. Fundamentally, their interest is commercial, not expressive. Rather, the fee set in the provision constitutes a reasonable cost of doing business, akin to a rental fee. As noted above, there is no indication that the amount, as set forth in the RFI5 is disproportionate to the actual cost of construction of a newsstand. Therefore, plaintiffs’ claim with respect to fees for new licensees is dismissed.
Second Cause of Action — Taking[12]
Plaintiffs contend that, having invested in the design, construction, and location of their newsstands, they will now have to remove them or they will be destroyed. Plaintiffs allege that they have each spent between $15,000 and $35,000 to build or purchase their newsstands, and that they had counted on being able to sell those structures to new licensees if they left the business. They further assert that the City has recognized both their substantial investment and their need to recoup that investment by establishing a mechanism to facilitate the sale of their newsstands. (See Notice of Intent to Surrender a Newsstand License.) Therefore, according to plaintiffs, Local Law 64 effects a taking of their property without just compensation in violation of article I, § 7 (a) of the State Constitution.
There appear to be two categories of plaintiffs potentially affected by this aspect of Local Law 64 — those who, because of the siting requirements, would not be able to relocate their newsstands, and those who, at some point in the future, would cease operating their newsstands. Plaintiffs contend that, because of Local Law 64, there would no longer be a market for their newsstands, and that, therefore, they are being, or will be, deprived of personal property in that it is being rendered valueless, and, but for the change of law, would have had substantial value.
Here, plaintiffs are being forced to remove their personal property. Law governing takings generally refers to real prop *168 erty. The United States Supreme Court has, however, applied a taking analysis to personal property as well. (See Andrus v Allard, 444 US 51, 67 [1979]; Long Cove Club Assoc., L.P. v Town of Hilton Head Is., 319 SC 30, 32-33, 458 SE2d 757, 758 [1995] [noting that the United States Supreme Court in Andrus was applying real property regulatory taking analysis to personal property], cert denied 516 US 1029 [1995].)
A taking may be classified either as a physical taking or as a regulatory taking. (Tahoe-Sierra Preservation Council, Inc. v Tahoe Regional Planning Agency, 535 US 302, 321-322 [2002].)
“A physical taking occurs where governmental action results in the permanent physical occupation, either by the government itself or a private, government-authorized party, ‘to the extent of the occupation, without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner.’ ” (Dawson v Higgins, 197 AD2d 127, 133 [1st Dept 1994], appeal dismissed 83 NY2d 996 [1994], cert denied sub nom. Dawson v Halperin, 513 US 1077 [1995].)
Here, there is no “occupation” of any property of the plaintiffs. The plaintiffs’ newsstands are situated on the public sidewalk, and the plaintiffs have no identifiable real property interest in the locations in question, as they were merely granted licenses to use the locations. (See Miller v City of New York, 15 NY2d 34, 38 [1964], citing Greenwood Lake & Port Jervis R.R. Co. v New York & Greenwood Lake R.R. Co., 134 NY 435, 439-440 [1892] [a licensee takes no interest in real property itself].) As the plaintiffs are free to remove their newsstands, implementation of Local Law 64 does not constitute a physical taking.
“To constitute a regulatory taking the challenged actions must be such that they fail substantially to advance a legitimate State interest or deprive the owner of the economically viable use of his property.” (Dawson, 197 AD2d at 135.) As discussed above, Local Law 64 clearly advances a legitimate state interest. However, whether the City is depriving the newsstand vendors of an “economically viable use of [their] property” is a more difficult question. (Id.; see also Nollan v California Coastal Comm’n, 483 US 825, 834 [1987].)
Plaintiffs maintain that, as a result of Local Law 64, there will be no secondary market for their newsstands, and that their property will be rendered absolutely worthless.
*169 Relying on Penn Central Transp. Co. v New York City (438 US 104 [1978] [the court must examine the “parcel” as a whole and. not divide it into segments]), defendants argue that merely losing the right to resell the newsstand structures does not effectuate a taking. Unlike Penn Central, where the plaintiff was challenging the reduction of the value of its property because of a loss of the use of its air rights, here plaintiffs complain that their property (the newsstand structures) will be rendered valueless by the operation of Local Law 64.
Defendants also argue that requiring some plaintiffs to move their businesses does not constitute a taking because they will be able to relocate elsewhere. The potential economic losses which might occur as a result of relocation are not, however, the focus of plaintiffs’ claim — rather, they focus on the alleged total loss in value of the physical structures for which they have spent tens of thousands of dollars to purchase or erect.
Finally, defendants argue that there is no taking at issue because “[t]here is no limit on the number of newsstands in the City. Anyone may set up a stand anywhere they want as long as the stand complies with applicable siting rules. These few newsstands need not disappear — they will . . . operate out of another location.” (Defendants’ mem in support of summary judgment at 39.) This argument is directly contradicted by Local Law 64, which states that “[n]o license shall be issued to an individual for the operation of a newsstand that is not a replacement newsstand and that has been constructed and installed by a franchisee pursuant to a franchise” (Local Law No. 64 [2003] of City of New York § 3; see also defendants’ mem in support of summary judgment at 13 [same]). Only the CSFF franchisee will be able to place newsstands, and plaintiffs’ current newsstands will be removed from their current locations, and will not be useable anywhere on New York City streets.
Whether Local Law 64 has, in fact, completely stripped plaintiffs’ current newsstand structures of all of their value has yet to be determined, but plaintiffs have sufficiently stated a claim and defendants have failed to meet their burden of establishing as a matter of law that there can be no regulatory taking. Defendants’ motion for summary judgment on the question of taking is, therefore, denied.
Plaintiffs’ motion for a preliminary injunction with respect to their second cause of action accordingly remains for decision. The State Constitution does not prohibit takings, but only takings without just compensation. (See e.g. NY Const, art I, § 7 *170 [a].) Although plaintiffs will not be able to use the newsstands they have built or purchased for their continuing businesses, pursuant to Local Law 64 they will be provided newsstands free of charge. Their only potential harm would occur if and when they cease being newsstand operators and can no longer recoup the investment they originally made. However, as several of the plaintiffs have attested, the physical structure of a newsstand does not have an infinite lifespan, and, therefore, undoubtedly, it decreases in value over time. Therefore, the extent of their damages, if any, would be difficult to determine. More important, for the purposes of plaintiffs’ motion for a preliminary injunction, to the extent that Local Law 64 may effect a taking, plaintiffs may be compensated financially for their alleged loss; therefore, a preliminary injunction is not appropriate. (See 1659 Ralph Ave. Laundromat Corp. v Ben David Enters., LLC, 307 AD2d 288 [2d Dept 2003].) Plaintiffs’ motion for a preliminary injunction based upon a taking is therefore denied.
Third and Sixth Causes of Action — Equal Protection[13]
Plaintiffs argue that Local Law 64 also violates the rights of the news vendors to equal protection of the laws, as secured under article I, § 11 of the State Constitution and the Fourteenth Amendment to the United States Constitution. Plaintiffs contend that the City Council has fundamentally misapprehended the purpose of PLOS requirements, and unfairly applies different PLOS requirements to different street furniture (e.g., a PLOS of 15 applies to sidewalk cafes, and no PLOS applies to bus shelters, information kiosks, newsracks, or trash receptacles).
“The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike.” (Nordlinger v Hahn, 505 US 1, 10 [1992].) “The general rule [for equal protection challenges to legislation] is that [the] legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest.” (Cleburne v Cleburne Living Center, Inc., 473 US 432, 440 [1985].)
*171 Facilitating the flow of pedestrians and wheelchair-bound persons on city sidewalks constitutes a legitimate governmental interest. There are sufficient differences between newsstands and the various types of street furniture that plaintiffs mention, with respect to size, function, the space occupied and the way in which they are utilized by passersby, to conclude that the FLOS classification established for newsstands is rationally related to that purpose. Newsracks and trash receptacles, which have no FLOS, are substantially smaller than newsstands, and pedestrians do not tend to linger at either form of street furniture. Although bus shelters may be closer in size to newsstands, they are designed to enable people to congregate on the street side, rather than the sidewalk side of the structure, and therefore bus shelters have a different impact on the flow of pedestrian traffic. Sidewalk cafes, where customers sit at tables, rather than standing on the sidewalk while examining the wares and making their purchase decision, also have a sufficiently different impact on street traffic to justify different FLOS requirements.
In short, the difference in treatment between newsstands and other forms of street furniture is rationally based. The plaintiffs’ equal protection challenge lacks merit as a matter of law. The third and sixth causes of action are dismissed.
Fourth Cause of Action — New York City Charter, SEQRA, and CEQR
Plaintiffs contend that, in passing Local Law 64, the City Council failed to comply with community input and environmental study requirements under the New York City Charter, and city and state environmental laws. Specifically, plaintiffs claim violations of Charter §§ 197-c and 363, SEQRA (ECL 8-0101 et seq.), CEQR, and General Municipal Law § 51.
Chapter 8, § 197-c of the Charter provides that requests for proposals involving improvement of real property subject to city regulation and other solicitations for franchises under section 363 shall be reviewed pursuant to the ULURP.[14]
In 1996, a substantially similar RFP for a CSFF was subjected to ULURP review (the 1996 CSFF). Provisions regarding the maximum area, height, and width of the newsstands, as well as siting criteria for newsstands, remain unchanged in the current RFP, except to the extent that the 2004 RFP sets forth *172 relaxed siting criteria for structures which will replace existing stands. Those relaxed criteria are intended to enable current newsstand operators, as much as possible, to remain in their current location. In addition, the 1996 CSFF had similar provisions governing the maximum size of advertising panels. The major difference between the 1996 CSFF and the current proposed version is the number of items of street furniture covered: (1) the number of newsstands was reduced from 500 to 330; (2) the number of bus shelters was reduced from 3,500 to 3,300; and (3) the number of pay toilets was reduced from 100 to 20. On March 19, 2004, the DCP reconfirmed that the new RFP would not present any new land use impacts or implications which would require new ULURP review.
Citing Orth-O-Vision v City of New York (101 Misc 2d 987 [Sup Ct, NY County 1979]), plaintiffs argue that defendants’ decision not to conduct a new ULURP review violates the Charter, and that, therefore, the RFP is null and void, and its implementation must be enjoined.
Plaintiffs argue that “the displacement of hundreds of newsstands with large, wrap-around billboard/advertising based newsstand structures will unquestionably have significant impact on the local landscape and on neighboring homes and businesses.” (Plaintiffs’ mem of law at 44.) As defendants have demonstrated, however, the previous ULURP review considered the replacement of existing newsstands with new newsstands with size, design, advertising and siting requirements substantially similar to those at issue here. The 2004 RFP does not substantially differ in terms of the local landscape from that previously considered so as to mandate a new ULURP review.
Plaintiffs contend, however, that changes in the City’s streetscape since 1996 require new review. For example, plaintiffs contend that there has been a dramatic increase in the number of public pay telephones (PPTs) on New York City streets since 1996 which requires review. This allegation is refuted by the Assistant Commissioner for PPT Franchises at the New York City Department of Information Technology and Telecommunications, who shows that the total number of PPTs has actually decreased since 1996.
Plaintiffs further argue that what they describe as thousands of planters and other concrete security barriers, which have been installed on Manhattan streets since September 11, 2001, constitute a significant change requiring new ULURP review. Plaintiffs have not demonstrated that any significant number of *173 these security barriers have actually been installed in the vicinity of existing newsstands, and that they, therefore, constitute a significant change that would require new review relating to newsstands. Furthermore, as defendants have shown, such security items have been installed at only 126 buildings south of 125th Street.
Plaintiffs also contend that the 1997 RFP did not require compliance with the ADA, which, according to plaintiffs, will significantly affect the size and location of the new newsstands, and, thus, new review is required. As defendants have demonstrated, however, the 1997 RFP did require ADA compliance.
Finally, plaintiffs contend that there has been a tremendous increase in phone-based curbside advertising, which mandates a new ULURP review. Although there may well be more advertising on PPTs since 1996, at issue here is a law which relates to advertising on approximately 300 newsstands throughout the city. Such an increase in advertising does not mandate a completely new ULURP process.
With ULURP review, as with environmental review, “[a] requirement of constant updating, followed by further review and comment periods, would render the administrative process perpetual and subvert its legitimate objectives.” (Starburst Realty Corp. v City of New York, 125 AD2d 148, 157 [1st Dept 1987].) Here, there has not been sufficient change in the CSFF RFP or the existing streetscape to mandate new ULURP review.
The only significant change in the current CSFF is that, unlike the previous plan, the current coordinated street furniture proposal does not involve a concession scheme, but instead maintains the current licensing scheme administered by DCA. However, that change does not have any obvious land use implications, and, therefore, does not trigger ULURP review. (See id.) In any event, “[t]he statutory scheme establishing community boards and authorizing nonbinding recommendations on the part of those boards does not preclude the ultimate adoption of contracts containing different, even substantially different, terms from those found in the proposals originally considered under ULURP” (Id. at 156.)
For these reasons, plaintiffs have failed to state a claim pursuant to the City Charter.
Plaintiffs also allege that the designated lead agency for Local Law 64 has failed to comply with SEQRA/CEQR regulations, because the DOT, in issuing a negative declaration regarding *174 the environmental impact of the RFR issued only conclusory documents in October of 2003, and did not take the requisite “hard look,” or undertake a “reasoned elaboration” of the areas of environmental concern. (See Matter of Fisher v Giuliani, 280 AD2d 13, 19-20 [1st Dept 2001].)
A four-month statute of limitations applies to challenges to SEQRA and CEQR claims. (Matter of Save the Pine Bush v City of Albany, 70 NY2d 193, 200 [1987].) Plaintiffs argue that the limitations period starts to run from the date of the issuance of the RFP On the contrary, the negative declaration, which is the subject of the SEQRA/CEQR claims, was made in October 2003. Thus, the plaintiffs were aggrieved by the negative declaration in October of 2003, and had, at the most, until March of 2004 to file a claim pursuant to article 78. (Stop-The-Barge v Cahill, 1 NY3d 218 [2003] [statute of limitations starts to run when the negative declaration becomes final].) The plaintiffs did not file a complaint in this matter until July of 2004. Thus, the challenges to the negative declaration are time-barred.
Attempting to resuscitate this claim, plaintiffs also argue that review of the negative declaration may be undertaken within the parameters of General Municipal Law § 51, which governs taxpayer actions. However, “[i]t is well established that a taxpayer action pursuant to section 51 of the General Municipal Law lies only when the acts complained of are fraudulent, or a waste of public property in the sense that they represent a use of public property or funds for entirely illegal purposes.” (Mesivta of Forest Hills Inst. v City of New York, 58 NY2d 1014, 1016 [1983] [emphasis added; citations and internal quotation marks omitted].) Here, the plaintiffs do not point to any fraudulent or illegal activities undertaken by defendants. Thus, their effort to base their environmental claim on General Municipal Law § 51 is unavailing.
In any event, review of a SEQRA determination requires the court to: (i) sustain an agency’s negative declaration unless the court concludes that it “was affected by an error of law or was arbitrary and capricious or an abuse of discretion” (Chinese Staff & Workers Assn. v City of New York, 68 NY2d 359, 363 [1986], quoting CPLR 7803 [3]), and (ii) determine whether the agency identified the relevant areas of environmental concern, took a “hard look” at them, and made a “reasoned elaboration for its determination.” (Matter of Merson v McNally, 90 NY2d 742, 751-752 [1997]; Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d 400, 416-417 [1986].)
*175 Thus, it is not the role of the court, as plaintiffs encourage, to evaluate the proposed action, substitute its judgment for that of the agency, choose among alternatives, or resolve contentions amongst experts. (Matter of Neville v Koch, 79 NY2d 416, 424-425 [1992]; Mobil Oil Corp. v City of Syracuse Indus. Dev. Agency, 224 AD2d 15, 25 [4th Dept 1996].) The application for review of the negative declaration is time-barred and without merit as a matter of law. As such, defendants’ motion for summary judgment on the fourth cause of action is granted with respect to plaintiffs’ claims based upon the City Charter and SEQRA/CEQR.
Seventh Cause of Action — Due Process[15]
Article I, § 6 of the State Constitution (the Due Process Clause) provides that “[n]o person shall be deprived of life, liberty or property without due process of law.” Plaintiffs maintain that Local Law 64 is void for vagueness both because of the use of the phrase “does not. . . otherwise create a hazardous condition” and because the provision regarding siting of newsstands built prior to 1991 remains in the law.
Plaintiffs also made these vagueness arguments as part of their First Amendment claims. Those arguments were previously rejected, and are rejected here as well.
Defendants’ motion for summary judgment is therefore granted with respect to plaintiffs’ seventh cause of action.
Motion Sequence Number 003
Plaintiffs seek an order compelling defendants to produce “plans, dimensional information, drawings and related documents sufficient to show the design, style, width, functionality, disability-law compliance, and advertising placement of the proposed new newsstand structures.” Plaintiffs maintain that the plans are necessary to defend against defendants’ cross motion for summary judgment. According to plaintiffs, the plans will allow the court to determine how compliance with applicable ADA regulations will be achieved, and to determine whether the scheme to place advertising on the newsstands under the CSFF is sufficiently narrowly tailored to both meet *176 legitimate governmental interests and satisfy the requirements of the First Amendment.
Given this court’s analysis (supra) discussing the First Amendment claims and the ADA claims as a matter of law, plaintiffs’ discovery request is denied as moot.
Accordingly, it is hereby ordered that plaintiffs’ motion for a preliminary injunction in motion sequence number 001 is denied; and it is further ordered that defendants’ cross motion for summary judgment is granted to the extent that the first, third, fourth, fifth, sixth and seventh causes of action are dismissed, and it is otherwise denied; the second cause of action (whether there was a taking, and the value, if any, of the physical structures) is severed and continued; and it is further ordered that plaintiffs’ motion for an order compelling discovery in motion sequence number 003 is denied; and it is further ordered, adjudged and declared that the issuance and implementation of the current RFP is legal.

. Specifically, the local law amends sections 20-228, 20-229, 20-231, and adds section 20-241.1 of the Administrative Code.

. Defendants include Iris Weinshall, Commissioner, Department of Transportation, City of New York; the Department of Transportation, City of New York (DOT); Gretchen Dykstra, Commissioner, Department of Consumer Affairs, City of New York; the Department of Consumer Affairs, City of New York (DCA); City of New York; Michael R. Bloomberg, Mayor of the City of New York; and each of the members of the Franchise and Concession Review Committee (including Mayor Michael R. Bloomberg, Comptroller William C. Thompson, Jr., Corporation Counsel Michael A. Cardozo, Director of the Office of Management and Budget Mark Page, Manhattan Borough President C. Virginia Fields, Brooklyn Borough President-Marty Markowitz, Bronx Borough President Adolfo Carrion, Queens Borough President Helen Marshall, Staten Island Borough President James P Molinaro, and Deputy Mayor for Operations Mark V Shaw).

. A negative declaration is a notice of determination of nonsignificance, which ends the SEQRA review process (6 NYCRR 617.6 [b] [3] [ii], [iii]; 617.7 [a] [2]) as to the environmental aspects of the project, so that preparation of an environmental impact statement is not required. (See Matter of 27th St. Block Assn. v Dormitory Auth. of State of N.Y., 302 AD2d 155, 158 [1st Dept 2002].)

. Free speech claims under the First Amendment and the New York State Constitution are subject to the same standards. (Housing Works, Inc. v Turner, 179 F Supp 2d 177, 199 [SD NY 2001], affd sub nom. Housing Works, Inc. v Giuliani, 2003 WL 56921, 2003 US App LEXIS 77 [2d Cir, Jan. 3, 2003].) Thus, the first cause of action for violation of plaintiffs’ free speech rights under the State Constitution will not be addressed separately, and plaintiffs’ free speech claims will generally be referred to as First Amendment claims.

. This court need not decide whether newsstand operators have standing to assert a speculative First Amendment violation on behalf of the public at large. Nevertheless, an attempt to assert such a supposed violation as a violation of the operators’ rights seems anomalous. Most New York City newsstands sell a wide assortment of general merchandise (e.g., cigarettes, soda, candy, etc.) besides newspapers and magazines. The licensees choose what publications and wares to sell; they determine how and where the materials are displayed. It is the licensees, not the City, who control the selection of reading matter offered at newsstands. Thus, the licensees both provide and limit public access.

. In Patel, while upholding New York City regulations which permitted the New York City Art Commission to approve or reject the location of a newsstand for aesthetic reasons, the court recognized that newsstands are entitled to some protection of the First Amendment. Like the court in Gasparo, the court in Patel indicated that an appropriate balance is struck where the restrictions are content-neutral and tailored to serve a significant government interest.

. This argument is also part of the seventh cause of action which seeks to void Local Law 64, on due process grounds, for vagueness.

. According to the City, only two of the 281 existing newsstands are less than three feet wide, and of those two, only one would be required to move if *162 it were rebuilt to ADA-compliant size. The City further contends that the one newsstand could be moved to a location within 500 feet of the existing stand.

. See n 5, supra at 158.

. It appears that the newsstand operators will continue to select the newspapers, magazines and miscellaneous merchandise that they sell; thus, they would not be compelled to carry material they find offensive. Anomalously, while speculating that the challenged local law will limit the public’s access to First Amendment material, newsstand operators themselves limit the selection of First Amendment material available to the public. (See n 5, supra at 158.)

. That said, however, the court would urge the City, and ultimately, the franchisee, to consult with, and attempt to accommodate individual newsstand operators who might have strong religious objections to particular advertisements, just as advertisers and retailers have learned to consult with community members and make reasonable accommodations concerning displays in particular communities.

. Plaintiffs base their taking claim on state law. Citing Santini v Connecticut Hazardous Waste Mgt. Serv. (342 F3d 118, 121 [2d Cir 2003], cert denied 543 US 875 [2004]), plaintiffs reserved their right to assert federal claims once their state remedies have been exhausted. Because state and federal law regarding taking utilize similar standards (see Wantanabe Realty Corp. v City of New York, 315 F Supp 2d 375, 401 [SD NY 2003]), and New York courts routinely cite and apply the reasoning of federal courts (see Matter of Friedenburg v New York State Dept. of Envtl. Conservation, 3 AD3d 86 [2d Dept 2003]), the court will rely on federal as well as state authority in this discussion.

. The scope of the Equal Protection Clauses of the federal and state constitutions is comparable. (Matter of Esler v Walters, 56 NY2d 306, 313-314 [1982]; see also Dorsey v Stuyvesant Town Corp., 299 NY 512, 530-531 [1949], cert denied 339 US 981 [1950].) Therefore, all alleged equal protection violations will be addressed together.

. The RFP for the CSFF indicates that it is the result of a determination pursuant to section 363 of the Charter.

. The state constitutional provision at issue is generally given similar meaning as the federal counterpart and will not be addressed separately. (See Henrietta D. v Giuliani, 119 F Supp 2d 181, 216 [ED NY 2000], affd sub nom. Henrietta D. v Bloomberg, 331 F3d 261 [2d Cir 2003], cert denied 541 US 936 [2004]; Matter of Metropolitan Life Ins. Co. v New York State Labor Relations Bd., 280 NY 194 [1939].)