[845 NYS2d 41]

Bernard Uhlfelder et al., Appellants, v Iris Weinshall, as Commissioner of the Department of Transportation of the City of New York, et al., Respondents.

First Department, November 8, 2007

APPEARANCES OF COUNSEL

*Emery Celli Brinkerhoff & Abady LLP*, New York City (*Andrew G. Celli, Jr., Eric Hecker* and *Mariann Meier Wang* of counsel), for appellants.

*Michael A. Cardozo, Corporation Counsel*, New York City (*Elizabeth I. Freedman, Leonard Koerner* and *Virginia Waters* of counsel), for respondents.

*Amanda Hiller*, New York City, for Municipal Art Society of New York, Inc., amicus curiae.

*Kramer Levin Naftalis & Frankel LLP*, New York City (*Jeffrey L. Braun, Samuel H. Lindenbaum* and *Toni L. Finger* of counsel), for Real Estate Board of New York, Inc., amicus curiae.

*Davis Wright Tremaine LLP*, New York City (*Victor A. Kovner, Carolyn K. Foley* and *Kevan D. Choset* of counsel), for Harper's Magazine Foundation and others, amici curiae.

## OPINION OF THE COURT

McGuire, J.

The plaintiffs in this action against the City of New York and individual city officials and agencies (collectively, the City) are 11 licensed newsstand operators in the City of New York and the New York City Newsstand Operators Association (the Association), a trade association of licensed newsstand operators. Plaintiffs challenge, on various constitutional and statutory grounds, Local Law No. 64 (2003) of the City of New York, which amends the Administrative Code of the City of New York in relation to the installation and maintenance of newsstands and the placement of advertising thereon.

Pursuant to Local Law 64, as implemented through a request for proposals (RFP) for a Coordinated Street Furniture Franchise (CSFF), all newsstands in the City (approximately 281 newsstands were in operation as of August 12, 2004) will be replaced by structures to be built, owned and maintained by a corporate franchisee. The existing structures are owned by the operators, each of whom is licensed by the Department of Consumer Affairs (DCA); the licensees either built the structures at their own expense or purchased them from prior licensees. The newly constructed newsstands, however, will be operated by the individual licensees who own the newsstands that are replaced. According to the City, the provisions of Local Law 64 governing the size and siting of newsstands will allow virtually all of the existing newsstands to be replaced at precisely or essentially the same locations. Although Local Law 64 affects the value of the ownership interest of licensees in their current newsstands, it does not affect the ownership interest itself. Thus, the licensees are free to remove their newsstands and retain (on private property) or dispose of them. If an existing licensee does not wish to retain his or her newsstand, the burden of removing the newsstand is cast upon the franchisee.

Although the franchisee will incur all the costs associated with replacing existing newsstands, a license applicant who wishes to open a new newsstand (as opposed to a "replacement newsstand") is not similarly given the free use of a newsstand constructed and paid for by the franchisee. Rather, pursuant to paragraph (2) of subdivision (c) of the new section 20-241.1 added to the Administrative Code by Local Law 64, a licensee who operates a newsstand "that is not a replacement newsstand and that has been constructed and installed by the franchisee . . . shall reimburse the franchisee for the cost of such construction and installation," as those costs are determined by the Department of Transportation (DOT).[1] With respect to annual maintenance and the costs of any repairs that may be needed, the financial burden is on the franchisee regardless of whether the newsstand is a new or a replacement newsstand.

---

1. According to the City, the "standard cost" of a new newsstand has been "capped" by DOT at $25,000, subject to adjustment for inflation. An addendum to the RFP specifies that the franchisee must provide an amortization option to operators of such nonreplacement newsstands; the amortization period must be not less than five years and the interest rate is set at prime plus one percent.

The economic engine behind the proposed CSFF is the revenue expected from the franchisee's sale of advertising on the newsstands (as well as other structures, including bus shelters), as authorized by Local Law 64. Thus, Local Law 64 amends Administrative Code § 20-231 (i) by qualifying its absolute prohibition on placing any exterior advertising on newsstands so as to permit such advertising provided it is "placed by a franchisee." The RFP permits the franchisee to place up to 82.5 square feet of advertising on newsstands, and reserves a minimum of 2.5% of all advertising panels on the newsstands for public service announcements and 20% of all advertising space for use by the City and its marketing partners, at no cost to the City or its partners. Under Administrative Code § 20-231 (d) (2), a newsstand cannot occupy more than 72 square feet of sidewalk space or exceed nine feet in height.[2]

The proposed franchise, which is for a period of 20 years, requires the franchisee to install and maintain a minimum of 330 newsstands; neither Local Law 64 nor the RFP limit the maximum number of newsstands. Under the RFP, the City is to receive an annual payment from the franchisee in the form of a franchise fee. The amount of the fee will be the greater of a guaranteed minimum payment or a specified share of the advertising revenue. The City estimates it will receive $1 billion in revenues from the CSFF over the 20-year period of the franchise.

Provisions of Local Law 64 governing the siting of newsstands also are relevant. The license of any newsstand operator will not be renewed if the newsstand "poses an obstruction to the free use of sidewalks by pedestrians" (Administrative Code § 20-231 [d] [1]). All newsstands, regardless of when they first were licensed, must be located so as not to (i) reduce the area maintained on the sidewalk for pedestrian movement below a width of 9.5 feet (the clear path requirement), (ii) be within five feet of a fire hydrant, (iii) create a level of service at the

---

**2.** The City maintains that DOT, which must approve the design of the newsstands, will not approve any design that interferes with the ability of newsstand operators to utilize the front window area of newsstands for display purposes. According to the City, a newsstand that is as large as the law permits, one that is nine feet high and occupies the maximum 72 square feet of sidewalk space, has 207 square feet of available advertising space on the back and two sides. The newsstands to be built by the franchisee will not be uniform in size. Rather, consistent with various size restrictions, including maximum width and length requirements of, respectively, 6.5 feet and 4 feet, operators will be able to select from a number of designs of varying size.

proposed location for the peak 15 minutes of the peak hour of a pedestrian flow rate equal to or greater than 11 people per minute per linear foot of clear path, as determined by DOT (the pedestrian level of service or PLOS requirement) (Administrative Code § 20-231 [d] [2] [a] [i]-[iii]; [b] [i]-[iii]). Newsstands must satisfy other specified siting criteria that vary somewhat depending on when a newsstand first was licensed, including criteria relating to proximity to a subway entrance and to intersections (Administrative Code § 20-231 [d] [2] [a] [iv]-[vi]; [b] [iv]-[v]). In addition, all newsstands, regardless of when they first were licensed, must not "otherwise create a hazardous condition" (Administrative Code § 20-231 [d] [2] [a] [vii]; [b] [vi]). The term "hazardous condition" is defined by two identically worded provisions, one applicable to newsstands first licensed on or after August 1, 1999 and the other applicable to newsstands first licensed prior to that date, to

> "include, but not be limited to, the location of a newsstand less than one foot, six inches from the curb, under a fire escape, within ten feet of a driveway or parking lot or within two feet from underground access points, such as utility access openings, ventilation grills, or cellar doors" (*id.*).[3]

The parties agree that all of the newly constructed newsstands must comply with the requirements of the Americans With Disabilities Act (the ADA) (42 USC § 12101 *et seq.*), although they disagree about certain specifics of those requirements and about the extent to which the replacement newsstands for existing newsstands might be required to relocate due to an inability to comply with both ADA requirements and the siting requirements of Local Law 64. The replacement newsstand for an existing newsstand that must be relocated as a result of these requirements may be able to be placed at a site within a radius of 500 feet from its existing location, the "catchment area," in which certain otherwise applicable siting requirements (but not, most notably, the clear path and PLOS requirements) are relaxed (Administrative Code § 20-231 [k] [5] [a]). If

---

**3.** Plaintiffs do not take issue with the City's contention that the clear path requirement is not new. According to the City, this requirement has been in existence since 1991 but has not been applied to certain newsstands existing before 1991. Under Local Law 64, however, the exemption for those newsstands is eliminated so that the clear path requirement applies to all newsstands. Nor do plaintiffs dispute the City's contentions that the PLOS requirement of Local Law 64 was required by prior law and that Local Law 64 relaxes certain of the previously-applicable siting criteria.

the replacement newsstand for an existing newsstand cannot, consistent with the siting and ADA requirements, be located within the catchment area, the operator is permitted to relocate to any other location in New York City where those requirements can be satisfied. The newsstand at the new location would be a "replacement newsstand" as that term is defined by Local Law 64, provided only that the operator's license was in full force and effect at the time of the removal of the noncompliant newsstand (Administrative Code § 20-228 [e] [ii]). Accordingly, the cost of constructing and installing the newsstand at the new location would be borne by the franchisee (Administrative Code § 20-241.1 [c] [1]).

With the filing of their complaint, plaintiffs moved by order to show cause for a preliminary injunction preventing the City both from implementing, applying or enforcing Local Law 64 and from entering into any CSFF contract pursuant to the RFP that includes or covers newsstands. After answering the complaint, the City cross-moved for summary judgment dismissing the complaint in its entirety. In a published opinion (10 Misc 3d 151 [2005]) the IAS court denied the motion for a preliminary injunction and granted the cross motion to the extent of dismissing all of the causes of action except the second, which was severed and continued. That cause of action, which is not at issue on this appeal, alleges that Local Law 64 renders valueless the ownership interest of the individual plaintiffs in their newsstands and thus effects a taking of their property without just compensation in violation of article I, § 7 (a) of the New York State Constitution.

On this appeal, plaintiffs contest both the denial of the motion for a preliminary injunction and the granting of the cross motion for summary judgment dismissing the complaint. As limited by their brief, plaintiffs' constitutional challenges to Local Law 64 and the RFP rest exclusively on First Amendment grounds.[4] In addition to those challenges, plaintiffs contend that the RFP for the CSFF should have been subject to review under

---

4. The City maintains that the operation of a newsstand on public sidewalks is not an activity protected by the First Amendment, relying on the plurality opinion of Judge Manion in *Graff v City of Chicago* (9 F3d 1309 [7th Cir 1993, en banc], *cert denied* 511 US 1085 [1994]). Judge Manion, joined by four other judges, concluded that the operation of a newsstand on a public way, unlike the operation of a newsrack on a public way, was conduct, not expressive activity, that the City lawfully could proscribe (*id.* at 1313-1317). Seven other judges, however, disagreed and concluded that the operation of such a newsstand was entitled to protection under the First Amendment

chapter 8, § 197-c of the New York City Charter, commonly known as the Uniform Land Use Review Procedure or ULURP, and that the City (and DOT in particular) failed to comply with applicable requirements of the State Environmental Quality Review Act (SEQRA) (ECL 8-0101 *et seq.*) and the City Environmental Quality Review (CEQR) (62 RCNY 5-01 *et seq.*). As we are in substantial agreement with the reasoning of the IAS court in its comprehensive opinion, we affirm.

█ Plaintiffs' first constitutional challenge to Local Law 64 contends that in prohibiting issuance of a license for a newsstand that is located so as to "otherwise create a hazardous condition" (Administrative Code § 20-231 [d] [2] [a] [vii]; [b] [vi]), Local Law 64 confers unfettered discretion on DOT officials in determining whether to refuse or revoke a newsstand license. Plaintiffs acknowledge that Administrative Code § 20-231 (d) lists various objective criteria for determining whether a newsstand's location creates a "hazardous condition." However, because that list concludes with what plaintiffs characterize as an "undefined, broad catch-all phrase," they maintain that DOT officials are afforded discretion "to determine on their own and without standards, what might constitute a 'hazardous condition.' " Indeed, according to plaintiffs, on account of the so-called "catch-all" provision, "a DOT official bent on censorship could inspect a newsstand that prominently displays newspapers or periodicals highly critical of City government, and then unilaterally declare that newsstand a 'hazardous condition' for any reason whatsoever."

This contention is without merit. To be sure, "in the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship" (*City of Lakewood v Plain Dealer Publishing Co.*, 486 US 750, 757 [1988]; *see also Shuttlesworth v Birmingham*, 394 US 147, 150-151 [1969] ["a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional"]). But, contrary to plaintiffs' position, the term "hazardous condition" is not an empty vessel into which any meaning whatsoever can be poured. Rather, the term is given content by

(*id.*at 1327 [Flaum, J., concurring]; *id.* at 1333 [Ripple, J., concurring]; *id.* at 1335 [Cummings, J., dissenting]). As did the IAS court, we dispose of plaintiffs' First Amendment claims on other grounds and do not decide the issue that divided the Seventh Circuit in *Graff.*

both the specific and objective examples of a "hazardous condition" set forth in the clauses that precede the two identically worded "catch-all" provisions (Administrative Code § 20-231 [d] [2] [a] [vii]; [b] [vi]), and the specific and objective examples of a "hazardous condition" set forth in the "catch-all" provision itself.

Obviously, the City Council cannot reasonably have been expected to anticipate and delineate every conceivable threat to safety that might be presented by the operation of a newsstand. In providing that the term "hazardous condition" includes but is not limited to the specified examples, the statute thus grants some discretionary authority to DOT officials. As is clear from *Ward v Rock Against Racism* (491 US 781 [1989]), the City Council was not required by the First Amendment to preclude the exercise of such discretion and thereby expose the public to additional threats to its safety. In that case, the sound-amplification guideline for a municipal bandshell required municipal officials to " 'provide the best sound for all events' and to 'insure appropriate sound quality balanced with respect for nearby residential neighbors and the mayorally decreed quiet zone' " in an area adjoining the bandshell (*id.* at 794). Rejecting a facial challenge under the First Amendment to this guideline, the Supreme Court stated that "[w]hile these standards are undoubtedly flexible, and the officials implementing them will exercise considerable discretion, perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity" (*id.*).

Although the discretion to determine whether the location of a particular newsstand presents a "hazardous condition" is open-ended in the sense that the listing of examples is not a closed set, that discretion is not "unbridled." Rather, it is cabined by the specific and objective examples that are enumerated in the statute. Any nonenumerated circumstance found by DOT to constitute a "hazardous condition" must present a threat to public safety that is sufficiently comparable to the statutory examples (*see People v Illardo*, 48 NY2d 408, 416 [1979] ["when foreseeable circumstances are too numerous or varied for particular enumeration, the Legislature, employing the familiar principles of '*ejusdem generis*' may permissibly rely on the courts to give content to (a general) phrase"; under the ejusdem generis canon of construction, a general phrase, "though susceptible of a wide interpretation, becomes one limited in its effect by the specific words which precede it; in the vernacular, it is known by the company it keeps"]).

Accordingly, the statutory specification of examples allows courts to police on an "as applied" basis determinations by DOT that a particular nonenumerated circumstance constitutes a "hazardous condition" (*see City of Lakewood*, 486 US at 758 [observing that without the "guideposts" provided by express standards, "*post hoc* rationalizations by the licensing official and the use of shifting or illegitimate criteria are far too easy, making it difficult for courts to determine in any particular case whether the licensor is permitting favorable, and suppressing unfavorable, expression"]). By contrast, in *Barbulean v City of Newburgh* (168 Misc 2d 728 [Sup Ct, Orange County 1995]), upon which plaintiffs rely, the discretion given to local officials to prohibit or permit protected expression was both open-ended and exceedingly broad. Thus, under the statutory scheme at issue in *Barbulean,* local officials were empowered to grant or deny special use permits on the basis of, inter alia, findings on such broad and subjective matters as whether the requested use was "essential or desirable to the public convenience or welfare" and would neither "impair the integrity or character of the zone or adjoining zones nor be detrimental to the [*sic*] health, morals or welfare" (*id.* at 734 n 6).

Plaintiffs' second First Amendment challenge to Local Law 64 is two-faceted. First, a content-neutral regulation of protected speech must be "narrowly tailored to serve a significant governmental interest" (*Clark v Community for Creative Non-Violence*, 468 US 288, 293 [1984]), and plaintiffs assert that three of the applicable requirements—the clear path and PLOS requirements and a requirement of the ADA governing the minimum, internal width of structures such as newsstands—are not "narrowly tailored." In addition, plaintiffs assert that the effect of permitting the franchisee to place advertisements on the newsstand will be a "serious reduction in display space" for the newspapers and periodicals they sell. In particular, plaintiffs protest the absence of a prohibition in Local Law 64 "against the franchisee's placement of an advertisement panel over or surrounding the upper front opening to the newsstand, where plaintiffs face the street, make their sales, and directly interact with the public."

The constitutional injury apprehended by the latter assertion is speculative. Although Local Law 64 does not so prohibit the placement of advertisements on the upper front portion of newsstands, nothing in the law requires that the advertisements it authorizes be placed on the front portion in such a manner as

to interfere, significantly or otherwise, with the ability of news-stand operators to display any of the publications or other merchandise they sell. As the City stresses, the RFP specifies that newsstands "must provide optimum conditions for selling and displaying newspapers, periodicals and convenience items as well as adequate storage." Moreover, DOT has committed that it will not approve of a design that impedes the front window area of the newsstand. Under these circumstances, we conclude that plaintiffs have raised only the mere and abstract possibility of constitutional injury (cf. *Laird v Tatum*, 408 US 1, 13-14 [1972] ["Allegations of a subjective 'chill' (on exercise of First Amendment rights) are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm"]).

With respect to the former assertion, concerning the "tailor-ing" of the requirements, the parties disagree about the extent of the relocations that the siting and ADA requirements may necessitate. Plaintiffs contend that 64 newsstands, some 22% of the total number, will be required to relocate (within or outside the 500-foot radius of the catchment area). The City maintains that only 12 newsstands would in any manner be affected by these requirements; that 11 of the 12 could either reduce their size at their current location or relocate within the catchment area; and that only one newsstand would be required to relocate beyond the catchment area.

We agree with the IAS court that this factual dispute is not decisive because even assuming the accuracy of plaintiffs' analy-sis of the number of newsstands that will be required to relocate, plaintiffs' claim that these requirements are not narrowly tailored is without merit. What is decisive is that although "a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests . . . it need not be the least restrictive or least intrusive means of doing so" (*Rock Against Racism*, 491 US at 798). To the contrary, "the requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less ef-fectively absent the regulation' " (*id.* at 799, quoting *United States v Albertini*, 472 US 675, 689 [1985]). The siting and ADA requirements unquestionably promote substantial government interests that would be achieved less effectively in their absence.

The particulars of these requirements are not compelled by any dictates of science or public policy but are a matter of judg-

ment. Thus, for example, plaintiffs argue that instead of setting the PLOS rate for newsstands at 11, the City Council could have set the rate at 15, the less restrictive rate that it set for sidewalk cafes. Similarly, plaintiffs protest the 9.5-foot clear path requirement for newsstands, as opposed to the "substantially more liberal" clear path requirements applicable to other types of street furniture (seven feet for bus shelters and eight feet for newsracks and public toilets). The exquisite particulars of these requirements are not dictated by the First Amendment. Rather, plaintiffs' objections to these particulars represent nothing more than irrelevant disagreement with the City over the extent to which the underlying government interests should be promoted (*Rock Against Racism*, 491 US at 800 ["The validity of time, place, or manner regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests or the degree to which those interests should be promoted" (internal quotation marks and brackets omitted)]; *see also Graff*, 9 F3d at 1320 [plurality op] [rejecting First Amendment challenge to ordinance specifying certain siting criteria for newsstands, including "eminently reasonable" requirements that stands not be located within three feet of a property line and must allow pedestrians at least six feet of clear passage, and refusing to "second-guess the city council's concerns"]).

■ The third of the plaintiffs' First Amendment challenges to Local Law 64 addresses the provisions requiring the operator of a newsstand "that is not a replacement newsstand and that has been constructed and installed by the franchisee pursuant to such franchise . . . [to] reimburse the franchisee for the cost of such construction and installation" as determined by DOT (Administrative Code § 20-241.1 [c] [2]; *see also* §§ 20-229, 20-241.1 [c ] [1]). Plaintiffs do not attack the specifics of the reimbursement requirement set forth in the addendum to the RFP, i.e., the cap of $25,000 and the amortization period not less than five years at prime plus one percent. Rather, plaintiffs' challenge is more sweeping. According to plaintiffs, the reimbursement requirement is an "impermissible levy" on First Amendment rights because while new licensees are required to underwrite the cost of constructing newsstands, they receive "no real estate rights whatsoever" in them, as the physical structures will be owned by the franchisee. Plaintiffs appear to acknowledge that the First Amendment does not require that

newsstand operators be provided with newsstands at no cost, for plaintiffs concede that the City could require "new licensees to pay for the cost of constructing newsstands that the licensees will then own." Thus, plaintiffs' position appears to be that the First Amendment requires that newsstand operators receive some legally protected property interest in the newsstand structures if the operators are required by law to pay, in whole or in part, the cost of constructing them. Because new licensees do not receive such a property interest, plaintiffs maintain that the reimbursement requirement of Local Law 64 both impermissibly permits the City and its "corporate agent," the franchisee, to profit from activity protected by the First Amendment and unnecessarily deters that activity. In addition, plaintiffs assert that the reimbursement requirement will "almost certainly preclude most potential licensees from engaging in protected conduct, because they will not be able to afford such a steep price without obtaining equity in the structure in return."

We conclude that neither the individual plaintiffs nor the Association has standing to challenge the reimbursement requirement of Local Law 64. "[A] plaintiff must show 'injury in fact,' meaning that plaintiff will actually be harmed by the challenged [governmental] action" (*New York State Assn. of Nurse Anesthetists v Novello*, 2 NY3d 207, 211 [2004]). The individual plaintiffs, however, are all licensed newsstand operators who will be receiving replacement newsstands from the franchisee free of charge (Administrative Code § 20-228 [e]; § 20-241.1 [c]).

As for the Association, to establish its standing it "must show that at least one of its members would have standing to sue, that it is representative of the organizational purposes it asserts and that the case would not require the participation of individual members" (*Nurse Anesthetists*, 2 NY3d at 211). The IAS court ruled that the Association has standing to challenge the reimbursement requirement because it alleged, in opposition to the city defendants' cross motion for summary judgment, that one of its members had submitted an application for a second newsstand license (10 Misc 3d at 166).[5] In so concluding, the IAS court erred. First, plaintiffs provide no reason to conclude that the Department of Consumer Affairs will grant the applica-

---

5. Plaintiffs also alleged that several members of the Association, including three of the individual plaintiffs, had "indicated" that they "intend[ed]" to apply for a second license at a new location (10 Misc 3d at 166). The IAS court ruled, and we agree, that "the claims of the members who are merely considering applying for new licenses are speculative" (*id.*).

tion of this Association member.[6] Only if the application were granted could the member be required to make reimbursement. Second, even if the application were granted, it does not follow that this member would be required to make reimbursement to the franchisee. That would depend in part on whether the license was granted before or after the franchise was granted. If the license were in full force and effect on the date the franchise is granted and the new newsstand thereafter provided by the franchisee "replaces a newsstand at the same location" (Administrative Code § 20-228 [e] [i]), the new newsstand would be a "replacement newsstand" (*id.*). Alternatively, a new newsstand is such a "replacement newsstand" if it replaces a newsstand that the City requires, for any reason, to be permanently removed from the location for which it is licensed, provided only that the license for the newsstand "is in full force and effect at the time removal is required" (Administrative Code § 20-228 [e] [ii]). Under either scenario, the licensee would not be required to reimburse the franchisee (Administrative Code § 20-241.1 [c] [1], [2]).

In short, this Association member's application for a new license is subject to denial and, even if it were to be granted, the member would not necessarily become subject to the reimbursement requirement. Accordingly, the contention that the member will "likely be injured" by the reimbursement requirement is "founded on . . . speculation" and "it is not at all obvious" that this member will suffer injury-in-fact (*Nurse Anesthetists*, 2 NY3d at 213 [internal quotation marks omitted]; *see also Clarendon Place Corp. v Landmark Ins. Co.*, 182 AD2d 6, 10 [1992] ["Any request for declaratory relief is premature if the standing for such an action is contingent on the happening of a future event which is beyond the control of the parties and may never occur"], *appeal dismissed and lv denied* 80 NY2d 918 [1992]).

We recognize that the City does not press on this appeal the contention that plaintiffs lack standing to challenge the

---

**6.** When there are competing applications for a license to operate a newsstand at a particular location, a preference is granted, in the following order, to: disabled veterans, handicapped persons, veterans who are not disabled and persons over the age of 62 (Administrative Code § 20-230). Plaintiffs provided no information about whether this member would be entitled to a preference, whether there were competing applications for each of the locations, the number of locations for which this member submitted applications, when the applications were submitted or any information about whether any competing applicants might be entitled to a preference under Administrative Code § 20-230.

reimbursement requirement, and that the defense of lack of standing may be waived (*Security Pac. Natl. Bank v Evans*, 31 AD3d 278, 280-281 [2006], *appeal dismissed* 8 NY3d 833 [2007]). The issue of standing, however, "the core requirement that a court can act only when the rights of the party requesting relief are affected" (*Society of Plastics Indus. v County of Suffolk*, 77 NY2d 761, 772 [1991]), is central to justiciability (*id*. at 772-773), and thus we are not precluded from addressing it because of the City's failure to pursue it on appeal (*Matter of Daniel C.*, 99 AD2d 35, 46 [1984] ["lack of standing in the context of the constitutionality of a statute is not a matter for waiver by parties, for it is the courts which must decide whether the parties have a sufficient stake in the litigation to necessitate constitutional adjudication"], *affd* 63 NY2d 927 [1984]). Moreover, "[w]e are bound by principles of judicial restraint not to decide constitutional questions unless their disposition is necessary to the appeal" (*Matter of Clara C. v William L.*, 96 NY2d 244, 250 [2001] [internal quotation marks omitted]). In addition, the existing record is not well developed on certain matters that are presumably relevant to the merits of this First Amendment claim, such as the useful life of the new newsstands and the extent to which new licensees may be able to obtain financing to meet the reimbursement requirement. For all these reasons, we conclude that we can and should uphold the dismissal of this claim on standing grounds.[7]

---

**7.** Although our concurring colleague's position may contain an unstated nuance, it appears to be that appellate courts are absolutely prohibited from resolving any issue not raised by the parties, even when doing so would not constitute an adjudication on the merits. Thus, our colleague sweepingly asserts that we "impermissibly seek to decide this appeal upon an issue not raised by either party to this appeal and thus not properly before us." The concurrence, however, cites no authority that so holds. The one case our concurring colleague cites, *McHale v Anthony* (41 AD3d 265 [2007]), undercuts his position, given that at least implicitly it recognizes that arguments asserted in the trial court but not pressed on appeal are not invariably off limits to appellate courts (*id*. at 266-267 ["arguments raised below but not pursued on appeal are *generally* deemed abandoned" (emphasis added)]). Nor does our concurring colleague offer any explanation why our obligation to be fair to the parties trumps our obligation "not to decide constitutional questions unless their disposition is necessary to the appeal" (*Clara C.*, 96 NY2d at 250 [internal quotation marks omitted]). Indeed, our colleague makes no mention of this broader obligation. Moreover, the concurrence provides no reason at all to conclude that any of the plaintiffs have standing. And if plaintiffs have no right to require that this constitutional question be decided, surely fairness considerations do not inflexibly obligate us to decide the question nonetheless. It is ironic that in the name of fairness to plaintiffs the concurrence would

■ Plaintiffs' fourth and final challenge on First Amendment grounds to Local Law 64 is that it compels them to associate with, foster and promote speech, in the form of the advertisements and public service messages to be placed on the newsstands they will operate, with which they might disagree. As plaintiffs put it, their position is that "Local Law 64 violates the First Amendment for the simple reason that it compels plaintiffs to associate with and to become unwitting instruments for the dissemination of messages—political, commercial or otherwise—over which they exercise no control." This claim, too, lacks merit.

As the IAS court recognized, *Wooley v Maynard* (430 US 705 [1977]), upon which plaintiffs rely, is distinguishable. In that case, the Supreme Court invalidated on First Amendment grounds a New Hampshire statute that required all noncommercial vehicles registered in New Hampshire to bear license plates embossed with the state motto, "Live Free or Die" (*id.* at 707). As the Supreme Court stated, "the right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all" (*id.* at 714). The New Hampshire statute was unconstitutional because it "in effect requires that appellees use their private property as a 'mobile billboard' for the State's ideological message or suffer a penalty" (*id.* at 715). Plaintiffs' claim of compelled speech is meritless precisely because they will not own the new newsstands or have any legally cognizable property rights in the exterior portions of the structures on which advertisements will be placed.

For this reason, as the IAS court stated, plaintiffs "have no more right to control the advertising on the structure from which they operate than the commercial or residential tenants of a building have to control advertising on the side of the building" (10 Misc 3d at 165). If the mere fact that the newsstands are operated by persons who have no control over the content of the advertising were sufficient to establish a First Amendment claim, the tenants of a government-owned building with billboards also would appear to have valid First Amendment

elect to saddle them with an adverse decision on the merits rather than permit the constitutional question to be decided in a future action. Another fairness consideration should be recognized: deciding that question now, at the behest of plaintiffs who appear to lack the requisite "concrete interest in prosecuting the action" (*Society of Plastics*, 77 NY2d at 772), entails the risks of an erroneous decision that would be prejudicial to future litigants who would have such a concrete interest.

claims. So too would the operators of municipally-owned buses with advertising panels on the sides.

Plaintiffs stake out a narrower position. They urge that "[t]he essential question is not what a plaintiff's 'ownership' interest is, but rather whether the public will *associate* the plaintiff with an unwanted, government-impaired message." Thus, plaintiffs go on to argue that although "it may well be that the public would not associate the message contained on a billboard with the tenants renting space in a residential building, there is little doubt that the public *will* associate the messages contained in the advertising contemplated by Local Law 64 with the former newsstand owners" who will operate the new structures.

Apart from the lack of empirical support for the assertion that the public will believe that the operators of the new newsstands exercise a measure of control over the content of the advertising on the newsstands, we reject the argument for two reasons. First, in the absence of a binding precedent requiring us to do so, we are loathe to predicate a finding that plaintiffs' First Amendment rights have been violated on what would be a *misconception* by the public. Second, this argument entails the proposition that the actual owner of the new newsstands, the franchisee, can display on its property only the messages with which the operators agree. That is, to vindicate the supposed First Amendment rights of those who do not own the new newsstands but erroneously are perceived to have control over the messages appearing on the newsstands, this argument would sacrifice the First Amendment rights of those who do own the newsstands and actually have control over those messages.[8] Although it is not essential to our conclusion, we note that nothing in Local Law 64 would prohibit the operator of a newsstand from using a portion of the available space in the front of the

---

**8.** Under plaintiffs' approach, moreover, the authority of municipalities around the country to obtain substantial revenues through the adoption of similar schemes would turn on whether the municipality previously authorized individuals or entities to own and operate newsstands on public sidewalks. It would at least be an oddity if a municipality which, for whatever reason, was hostile to such newsstands and never permitted them to operate, would be in a superior position than New York City to obtain the benefits of a law like Local Law 64. Plaintiffs' position seems implausible for another reason. As the owner of the sidewalks, the City surely could construct, or authorize a franchisee to construct, free-standing displays containing advertisements that would abut and surround the back and sides of all existing newsstands. Suffice it to say that it is difficult to see how the differences between such a scheme and the one contemplated by Local Law 64 could be of constitutional moment.

newsstand to display a sign making clear that the operator has no control over the content of the messages on the advertising panels (*cf. PruneYard Shopping Center v Robins*, 447 US 74, 87 [1980] [rejecting First Amendment challenge by privately owned shopping center to California constitutional provisions that permit individuals to exercise free speech and petition rights on the property of a privately owned shopping center to which the public is invited, and observing that shopping center and its owner could "expressly disavow any connection with the message by simply posting signs in the area where the speakers or handbillers stand"]).

Finally, plaintiffs' nonconstitutional claims are unavailing. For the reasons stated by the IAS court, plaintiffs' ULURP claim is without merit (10 Misc 3d at 171-173). The SEQRA and CEQR claims are subject to and barred by the four-month statute of limitations applicable to CPLR article 78 proceedings (*id.* at 174-175, citing, inter alia, *Matter of Save the Pine Bush v City of Albany*, 70 NY2d 193, 200 [1987]), and plaintiffs cannot avoid the four-month limitations period by denominating their action as one under General Municipal Law § 51 (*id.* at 174; *see Solnick v Whalen*, 49 NY2d 224 [1980]).

Accordingly, the order of Supreme Court, New York County (Michael D. Stallman, J.), entered September 15, 2005, which, insofar as appealed from, denied plaintiffs' motion for a preliminary injunction and granted defendants' cross motion for summary judgment to the extent of dismissing all causes of action other than the second cause of action, should be affirmed, without costs or disbursements.

ANDRIAS, J. (concurring in the result only). I would affirm for the reasons stated by Justice Stallman, who found, in pertinent part, that the provision in Local Law No. 64 (2003) of the City of New York requiring new licensees to pay the franchisee for the cost of constructing the new newsstands does not constitute an impermissible burden on First Amendment activity. Plaintiffs argue that there is no authority for the proposition that a governmental agency may require licensees to pay tens of thousands of dollars to a franchisee in order to engage in First Amendment activity. However, as found by the motion court, "[t]he new licensees, like plaintiffs, seek to use public property for private purposes. Fundamentally, their interest is commercial, not expressive. Rather, the fee set in the provision constitutes a reasonable cost of doing business, akin to a rental fee" and "there is no indication that the amount, as set forth in

the RFP, is disproportionate to the actual cost of construction of a newsstand" (10 Misc 3d 151, 167 [2005]).

To the extent that my learned colleagues do not reach this issue upon their finding that plaintiffs lack standing to challenge such requirement, they impermissibly seek to decide this appeal upon an issue not raised by either party to this appeal and thus not properly before us. While recognizing that the City does not argue plaintiffs' lack of standing on appeal and that the defense of lack of standing may be waived, they nevertheless conclude that inasmuch as standing is central to justiciability, this Court is not precluded from addressing it because of the City's failure to pursue its objection to plaintiffs' standing on appeal. While such conclusion might be warranted had the City raised plaintiffs' lack of standing for the first time on appeal (*cf. Murray v State Liq. Auth.*, 139 AD2d 461 [1988]), here the City unsuccessfully raised the issue of plaintiffs' standing at nisi prius, and then abandoned the issue on appeal.

As this Court has recently held:

"[A]rguments raised below but not pursued on appeal are generally deemed abandoned. Thus, any arguments pertaining to standing are not properly before us and should not be considered. To do so would be so unfair to the parties, who have presented what they think are the determinative issues for this Court to decide only to be blindsided by a decision based on issues not even raised or addressed in their briefs, as to implicate due process concerns" (*McHale v Anthony*, 41 AD3d 265, 267 [2007] [citations omitted]).

In any event, the majority's conclusion that the IAS court erred in finding that plaintiff association had standing is entirely based upon speculation that the member's application for an additional newsstand might be denied and, even if granted, the member would not necessarily become subject to the reimbursement requirements. Unlike *New York State Assn. of Nurse Anesthetists v Novello* (2 NY3d 207 [2004]), where the issue of standing was fully briefed and argued on appeal and the record led the Court of Appeals to conclude that plaintiff failed to demonstrate an in-fact injury sufficient to meet the first prong of the test for standing, there is no basis in the record before us for such a conclusion in this case.

NARDELLI and BUCKLEY, JJ., concur with McGUIRE, J.; ANDRIAS, J.P., and SWEENY, J., concur in the result only in a separate opinion by ANDRIAS, J.P.

Order, Supreme Court, New York County, entered September 15, 2005, affirmed, without costs or disbursements.